STATE OF NEVADA, RESPONDENT, *v.* ALBERT EVERETT SALA, APPELLANT.

No. 3450

May 31, 1946. 169 P. (2d) 524.

*Taylor H. Wines* and *D. A. Castle,* both of Elko, for Appellant.

*Alan Bible,* Attorney General, *George P. Annand* and *Homer Mooney,* Deputy Attorneys General, of Carson City, and *A. L. Puccinelli,* District Attorney of Elko County, for Respondent.

## OPINION

By the Court, HORSEY, J.:
On October 30, 1945, an information was filed in the

Fourth judicial district court of the State of Nevada, in and for the county of Elko, charging the appellant, Albert Everett Sala, with the crime of murder in the first degree. It was alleged in said information that the said Sala, on the 7th day of September 1945, about 5.4 miles east of Boone Springs, in the county of Elko, State of Nevada, did then and there willfully, deliberately, and premeditatedly, with malice aforethought and with the intent then and there to kill one Edward Alfred McCollum, strike said Edward Alfred McCollum upon the head with a hammer or wrench, causing mortal wounds to said McCollum and thereby causing his death, on September 11, 1945.

The appellant, on the 1st day of November 1945 was brought into court for arraignment upon said charge, and, upon the request of the defendant that counsel be appointed for his defense, the court appointed attorneys D. A. Castle, Esq., and Taylor H. Wines, Esq., to represent appellant in all further proceedings in the case. The arraignment then proceeded, and the defendant entered a plea of not guilty by reason of insanity. The court thereupon, with the consent of respective counsel, set the case for trial commencing on the 6th day of November 1945 at ten o'clock a. m.

On the 6th day of November 1945, upon the case being called for trial, the defendant, by his attorneys, asked leave to withdraw his plea of not guilty by reason of insanity, and enter a plea of guilty. The information was thereupon reread to the defendant, and he entered a plea of guilty.

Said plea, being without specification as to the degree of the crime, was deemed and considered by the court as a plea of guilty to the crime of murder in general, and the court thereupon proceeded, pursuant to the provisions of sections 10068 and 11042, Nevada Compiled Laws 1929, by examination of witnesses, to determine the degree of the crime. Thereupon, on November 6 and 7, 1945, the testimony of witnesses was taken, and certain documentary and other evidence adduced, which was

duly admitted, and thereafter, on said 7th day of November 1945, after the arguments of counsel had been heard, the case was duly submitted to the court, without a jury, for the purpose of determining the degree of the crime. The court, thereupon, rendered its decision determining the degree of the crime to be murder of the first degree, and, upon the consent of the defendant and his attorneys, set the 10th day of November 1945, at the hour of 9:30 o'clock a. m., as the time for pronouncing judgment and sentence upon the defendant. At the appointed time, the defendant and his said attorneys and the district attorney being in court, the court, no legal cause or excuse having been shown, or offered, by the defendant, after he was accorded the right so to do, why judgment should not be pronounced, proceeded to, and did, pronounce judgment upon the defendant for the crime of murder in the first degree, of which he had been duly convicted, upon his plea of guilty and upon the determination of the court, in such proceedings under sections 10068 and 11042, N. C. L. 1929, that said crime was murder in the first degree, that he should suffer the death penalty, at the time, place and in the manner in said judgment and sentence prescribed.

It is from such order of determination of the said district court, determining that the defendant (the appellant) is guilty of murder in the first degree, and from said judgment and sentence of death, that the appellant has appealed to this court.

Appellant's exception No. 1 is stated as follows:

"That the district judge abused his discretion in finding the defendant guilty of first degree murder, in that the finding and the conviction is contrary to the evidence and the law, in that the evidence will not support a conviction of first degree murder."

From the evidence, it appears that the deceased, Edward Alfred McCollum, left the home of his niece, Mrs. Shirley Hammers, in San Fernando, California, about 9:30 or 10:00 o'clock on the morning of September 4, 1945, driving a Plymouth two-door coach or

sedan, and that he intended to drive to Reno, Nevada, to consult certain court records, as to whether his wife had obtained a divorce (as she had told him she had), and then to drive on to his former home in South Dakota, which he had not visited since leaving there in 1902. Mrs. Hammers testified that Mr. McCollum was carrying with him a black zipper wallet, a bill fold of the envelope type, a coin purse and a wrist watch, besides a bed roll, suit cases, a tool box and a bag of miscellaneous articles, in the car. Mrs. Hammers knew Mr. McCollum had considerable money in the bill fold; he showed her the money, just rifling through it with his thumb, and she doesn't know how much he had.

There were no witnesses who testified with certainty as to seeing Mr. McCollum from the time he left his neice's home, in San Fernando, California, on the morning of September 4, 1945, until the early morning of September 7, 1945, at which time Mr. McCollum and the appellant, Sala, drove into the Miller Service Station, at Ely, Nevada. Earl Ray Miller testified that Mr. McCollum purchased gasoline from him early that morning. He identified Sala, positively, in the court room. He testified that he had seen McCollum at the White Pine County hospital, at Ely, Nevada, after McCollum had been brought there, terribly injured, and positively identified him as being the man who had purchased the gasoline at his service station, the means of identification being that he had observed that a thumb and forefinger were missing from McCollum's left hand. Among other things, Mr. Miller testified that Sala was sitting alongside Mr. McCollum in the automobile, before their departure from the service station, and that Mr. McCollum took out a black zipper wallet from his back pocket, to pay for the gasoline; Mr. Miller further testified he saw five or six twenty-dollar bills in the wallet, as McCollum fingered through the bills and obtained a five-dollar bill, which he handed Mr. Miller, to pay for the gas. This visit to the service station, according to Miller,

was somewhere from 3 : 00 to 4 : 30 a. m. on the morning of September 7, 1945.

It was at about 6 : 35 a. m. that same morning that John William Pratt, employed by the state highway department, accompanied by a Mr. Gardner and a Mr. Wreck, found Mr. McCollum lying on the edge of the oiled portion of highway 50, about 5.4 miles east of Boone Springs, Elko County, Nevada, in such condition as to show he had been terribly beaten. His face and hair were matted with blood, his face was swollen so he could not see, and he could not speak. While Mr. Pratt was there, and before he went back to Boone Springs to call the sheriff's office, at Ely, Mr. McCollum had taken from his back pocket a black zipper wallet, which, by means of a registration slip in it, an operator's license and a Pacific Union Life Insurance identification card, was later identified by Mrs. Hammers as being the wallet she had seen at San Fernando, and knew belonged to her uncle, Mr. McCollum.

Mr. Pratt testified that he took this wallet from Mr. McCollum, laid it alongside him, on a blanket, and, later, took it from there, and kept it until the officers arrived; that he took no money from it.

When Mr. McCollum was undressed and searched, after reaching the hospital, a bill fold of the envelope type was found on his person, between his undershirt and outside shirt, down next to, and held by, his belt, and the bill fold contained one thousand dollars in traveler's checks and $300 or $310 in ten and twenty dollar bills, placed in between the traveler's checks and folded with them.

Also, a coin purse was found on Mr. McCollum, and contained about six dollars. He also had a wrist watch on his wrist when taken to the hospital.

As to the factual background of this case, from the time McCollum and Sala met and commenced traveling together, which Sala says was on September 6, 1945, about fifty or sixty miles from Fallon, Nevada, until the

finding of Mr. McCollum, on the early morning of September 7, 1945, except for the short time at the Miller Service Station, in Ely, and that Sala was identified by a cook from the Lincoln Hotel, of Eureka, Nevada, as having drunk coffee there about 9:00 or 10:00 p. m., September 6, and that an older, heavy set man was with him in the bar, we are dependent entirely upon Sala's statement, State's exhibit No. 5, and such inferences as can reasonably be drawn therefrom and from the surrounding circumstances.

Appellant's attorneys, basing their contention upon the theory that both the first beatings and second beatings of McCollum, by Sala, were continuous, and were due entirely to uncontrollable passion aroused in Sala by improper advances, of a sexually perverted nature, by McCollum toward him, assert that there was an absence of any intention to kill McCollum; that if death resulted from the beatings, the killing was not willful and premeditated, and, at most, was murder of the second degree. They, therefore, contend that the determination of the trial court that the appellant is guilty of murder in the first degree, and that the court's judgment and sentence of death, are contrary to the evidence and the law.

We should state emphatically that it is unreasonable to believe that if such improper advances occurred (and for reasons to be hereinafter set forth, we do not believe they did), that the third or fourth of such advances would have affected appellant so differently from the others. His statement, on pages 1 and 2 of State's exhibit 5, in regard to such alleged advances, is to the effect that McCollum, after they had been riding about an hour, started to get familiar with him, that he did this two or three times before they arrived at Ely; however, that at each small town, as they came to them, they tried to get a room; that they also had a drink or two in each town. So it is apparent the first two or three advances (if they occurred) did not frighten appellant or interfere with their friendliness. The appellant

does not claim he was afraid or that he objected to taking a room with McCollum, if they could obtain one, and they exhibited friendliness by taking drinks together. Appellant relates in his statement, that after they left Ely he caught McCollum staring at him from time to time, and McCollum also got familiar with him, by occasionally rubbing his hand (we now quote from page 2 of Sala's said statement), "not on my privates, but over my leg. However, I went to sleep, and when I awakened the car was stopped. McCollum was standing on my side of the car and was rubbing my chest and legs. I told him to get away from me (this is the first indication of resentment), and he told me to take it easy, that no one was going to hurt me. I told him to get away again and he didn't do it so I started to get out of the car. My hand fell on a ball pean hammer which was in the glove compartment. The glove compartment was standing open at the time. When McCollum didn't leave me alone, I hit him across the face with the head of the hammer." (The first indication of anger). "He put his hands to his head and started moaning and ran around to the other side of the car. I followed him around there and hit him several times with my fists. I then hit him several times with the hammer and he fell down. I was going to hit him again but as I brought the hammer back for another blow I discovered the head had broken off." (Now, according to his story, his reasoning faculties have returned and are operating again—the anger is waning). "Then I kicked him once" (the last display of anger) "and dragged him over to the side of the road. I believe I threw the handle away at that time." (All the foregoing parenthetical expressions are ours.)

"I started to get into the car believing that I would drive it to Salt Lake City. However, I noticed that he got up and started coming toward me. The lights of the car were not on but it was light enough so that I could see him. I believe this episode occurred about 4:00 a. m. on the morning of September 7. When I

saw McCollum coming after me, I reached into the *gove* compartment again and the first thing I found was a monkey wrench. I picked this up and hit him in the face several times more with it. He fell down that time and stayed down. I recall that I hit him a number of times with the wrench but I don't recall how many. I wondered at the time where he got the resistance to take the beating that he was taking without falling down. After McCollum *fell down* the second time, I got into the car and drove toward Wendover, Utah."

It is clear that the first series of beatings, *i. e.,* those with the hammer and then with appellant's fists and then several times with the hammer again, until the handle was broken, were very severe. According to Dr. Rapp's testimony, the autopsy disclosed at least three basal fractures of the skull, one of which "extended from the frontal region over the right eye brow, and extended into the nasal sinus, and then proceeded posteriorly to the base of the skull." Most likely, the blow "across the face" with the hammer, as appellant describes it, or the blow when the hammer handle was broken, caused this fracture.

It would be absurd to argue, and appellant doesn't claim in his statement, that when he started to get in the car, believing he would drive it to Salt Lake City, and noticed that McCollum got up and started coming toward him, he expected McCollum to make any further advances, such as he claimed he had made before. A man severely and probably mortally wounded, was certainly not in a condition to assume any such attitude toward a person who had so wounded him. Sala doesn't claim, either, that McCollum was approaching him in any threatening attitude, or that he was doing other than a man badly beaten and wounded almost to the point of death, and probably whose only hope of succor was by use of his automobile, would do. A man so wounded would naturally try to reach his car, with the hope of driving to where he could, perhaps, phone for

medical aid; and if he saw some one about to steal the car, it was natural for him, and he had the right, to try to prevent such theft.

All Sala said in that respect was that he "started coming toward me," and, in another connection, "when I saw McCollum coming after me * * *." It will be noted that it was then (that is to say, according to appellant, "When I saw McCollum coming after me, I reached into the *gove* compartment again and the first thing I found was a monkey wrench"), that the second series of beatings commenced. Appellant was not then in the throes of angry, irresistible passion, if he ever had been. Indeed, for some time prior to, and during the time of administering the blows with the wrench, he appears to have been in full possession of his reasoning faculties, and to have been thinking, planning and acting with cool intent and deliberation. He quit the beatings with the hammer when he discovered the handle had broken, for the reason he could not use it effectively. He saw McCollum was helpless on the road, and evidently to prevent any passing motorist discovering him there, he dragged him, not only to the side of the road, as he says, but, most likely, considerably farther. The measurements of Tom Williams, assisted by Bryan Robison and Norman Brown, show that there was, definitely, a drag mark from where the ball peen hammer head, with a part of the handle in it, was found on the shoulder of the highway, extending a distance of 15 feet 11 inches, to where a dental plate (evidently belonging to McCollum) was found, showing he had been dragged at least that distance. The point to which he was thus dragged was in the bar pit of the highway, about 18 inches below the level thereof, according to the testimony of Tom Williams. Sala evidently was not under the influence of anger or irresistible passion when he was reasoning so intelligently to accomplish his purpose of rendering less likely the discovery of McCollum before he had time to steal the car and flee. After thus dragging McCollum

to the point in the bar pit, Sala, who, during all this time, if he had been angry before, had further opportunity for his passion to cool, started to get in the car, believing he would drive to Salt Lake City. He was still reasoning and deliberating. The car in which he came to Reno had broken down east of Fallon. He needed a car anyway, and he undoubtedly wished to flee before his crime was discovered. He even thought, or premeditated beforehand, as to where he would go, and formed the belief that he would go to Salt Lake City. He then noticed McCollum had gotten up and was coming toward him. He noted, and remembered, it was light enough to see him, although the lights of the car were not on. He said, in his statement, he believed it was about 4:00 a. m., so he must have mentally noted the time. He had determined to take the car. The owner was coming toward him. He did what many robbers do when the owner appears on the scene, that is, he resented interference, or possible resistance. He reasoned as to where he would find a weapon, probably in the glove compartment, found a monkey wrench, which he knew was a dangerous and deadly weapon, picked it up, and hit McCollum several times with it, in the face. He stated that McCollum fell down and stayed down. His next sentence, in his statement, shows that, coldly and deliberately, he was pondering every movement. At that point he stated, in the third paragraph on page 2 of his statement (State's exhibit 5): "I wondered at the time where he got the resistance to take the beating that he was taking without falling down. * * *." In other words, knowing that he had wounded McCollum very seriously before, by the first series of beatings with the ball peen hammer, he wondered how he could stand so many more blows. Evidently, when he was about to strike each successive blow, he pondered upon McCollum's condition, with the definite objective of beating him with a deadly weapon, the monkey wrench, until all possible resistance was overcome. He

was waiting for him to fall down again, at least unconscious, and, as he had reason to believe, mortally wounded.

■■ There is no evidence whatever, not even Sala's statement, which indicates that the second series of beatings was because of any improper advances then made, or that, if any such advances had occurred, there remained any remnant of passion or anger resulting from them. On the contrary, the evidence shows that Sala, at least from the time he discovered the hammer handle was broken, and kicked McCollum once, and then started to drag him to the side of the road, was in full possession of his mental faculties, was reasoning intelligently and cooly, and that his every act was intentional or willful, and not under the influence of any passion or anger. It is a sound principle of law, which has been heretofore approved by this court (as stated on page 11 of respondent's brief), that: "A person of sound mind and discretion may be presumed to intend all the natural, probable and usual consequences of his act; and when one person assaults another violently, with a deadly weapon, in a manner reasonably calculated to produce death, and the life of the party assaulted is actually destroyed in consequence of such assault, a jury is entitled to presume that death was intended, unless from a consideration of all the evidence, [they] entertain a reasonable doubt whether such intention did exist." State v. Hall, 54 Nev. 213, 13 P. 2d 624, 632; State v. Muldoon, 51 Nev. 322, 274 P. 922.

In the instant case, there is not only the presumption that death was intended, because of the assault with a deadly weapon in a manner reasonably calculated to produce death, but, also, the knowledge on the part of Sala, at the time of the second series of blows with a wrench, of his previous assault upon McCollum with the ball peen hammer, from which McCollum had only a few minutes before been unconscious, rendering more probable the fatal effect of the second beatings.

The crime of murder is defined in section 10066, Nevada Compiled Laws 1929, as follows:

"Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned."

Malice is defined in section 10067, Nevada Compiled Laws 1929, as follows:

"Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."

Section 10068, Nevada Compiled Laws 1929, deals with the degrees of murder, how the degree shall be determined, the procedure in the event of confession in open court or a plea of guilty, and the method of determining the punishment. Said section is as follows:

"Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart. All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, or burglary, or which shall be committed by a convict in the state prison serving a sentence of life imprisonment, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree; and the jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, designate by their verdict whether it be murder of the first or second degree; but, if such person shall be convicted on confession in open court, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and give sentence accordingly.

Every person convicted of murder in the first degree shall suffer death or confinement in the state prison for life, at the discretion of the jury trying the same; or upon a plea of guilty the court shall determine the same; and every person convicted of murder of the second degree shall suffer imprisonment in the state prison for a term of not less than ten years, and which may be extended to life."

■ While Sala's attorneys contend that his acts were continuous and in the heat of an irresistible passion, he has not so stated in his statement. He has not stated that there was any attack upon him by McCollum, nor any offer of further advances, upon the occasion of the second beatings, nor prior thereto and after McCollum had recovered consciousness and was coming toward the automobile. Neither has he claimed that he, Sala, was "sore" at McCollum, or hated, or disliked him, on account of any previous trouble; nor has he claimed that because of any recurrence of anger, when he saw McCollum coming toward him, he attacked him with the wrench. If it was because of hatred, dislike, or revenge because of any prior advances, the crime is murder in the first degree, if willful, deliberate and premeditated, as Sala's crime clearly was. But there is no evidence which would justify any reasonable hypothesis other than that the last series of beatings, that is, those with the wrench, were for the purpose and with the motive of robbing McCollum of his automobile. As shown by the foregoing definition of the degrees of murder (sec. 10068, N. C. L.), when a killing is done in the perpetration or attempt to perpetrate robbery, or any other of the enumerated felonies, it is not essential for the state to prove that it was willful, deliberate, and premeditated, and for that reason we will not dwell further at this time upon those elements in the definition of first degree murder. But the appellant, in his opening brief, on page 4, has stated:

"4. It is true that the defendant left the scene in the

deceased's car, but in view of the provisions of section 10109, Nevada Compiled Laws 1929, which provides '* * * if (referring to personal property) used merely as a means of escape it does not constitute robbery * * *' and it is submitted that robbery of the car has not been shown. The car was used for escape following the beating of the deceased."

Section 10109 N. C. L., is as follows:

"Robbery is the unlawful taking of personal property from the person of another, or in his presence, against his will, by means of force or violence or fear of injury, immediate or future, to his person or property, or the person or property of a member of his family, or of anyone in his company at the time of the robbery. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. If used merely as a means of escape, it does not constitute robbery. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear. Every person who shall commit robbery shall be punished by imprisonment in the state penitentiary for not less than five years; providing such robbery is committed upon any train traveling upon any railroad within this state the jury may, in its discretion, impose the penalty of death or the court in the event of a plea of guilty, may impose such death penalty."

A careful reading of the foregoing definition of robbery readily discloses that while, in a certain sense, the sentence, "If used merely as a means of escape, it does not constitute robbery. * * *" refers to personal property, the words "personal property" are not implied or understood following the word "if" and before the word "used." The subject of the sentence, as in the case of the sentence immediately preceding, is the words "force or fear." It is apparent both these sentences are

dealing with the element of force or fear, and its application, as an ingredient of the crime of robbery: "Such force or fear (to constitute robbery) must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; * * *. If (such force or fear be) used merely as a means of escape, it does not constitute robbery." Thus it will be seen that it is not the words "personal property" which are understood or implied in the sentence last above mentioned, but the words "such force or fear be." This principle embodied in the foregoing definition, making a clear distinction between force or fear used in obtaining or retaining the possession of the property, or to prevent or overcome resistance to the taking, and force or fear used merely as a means of escape, is generally recognized and embodied in the definitions of the crime of robbery, in the several states.

In 46 Am. Jur. sec. 19, p. 148, it is stated: "Sec. 19. Time of Exercise of Force or Intimidation. The violence or intimidation must precede or be concomitant or contemporaneous with the taking. Hence, although the cases are not without conflict, the general rule does not permit a charge of robbery to be sustained merely by showing a retention of property, or an attempt to escape, by force or putting in fear. The above doctrine has further frequent application where force or intimidation has been exercised after the property came into the defendant's hands through stealth, snatching or on delivery in expectation of immediate cash payment or for a special purpose. Discrepancies in the decisions of some states arise because of the uncertainty as to when the taking is completed. * * *"

While the use of force merely in the retention of property previously taken without force, does not, under the rule prevailing in probably a majority of the states, constitute robbery, our statute, section 10109, Nevada Compiled Laws 1929, by its express language, does provide that the use of force or fear to prevent or overcome resistance to the retention does constitute robbery.

In 58 A. L. R., pp. 656 to 665, there occurs an extensive annotation dealing with the distinction between use of force or fear in committing robbery and the use of force or fear as a means of escape, citing many cases, and discussing some of them. The general rule is stated on page 656, as follows:

"Though the decisions are not without conflict, the general rule requires that, in the offense of robbery, force or putting in fear be employed before, or at the time of, the taking of property, and does not permit a charge of robbery to be sustained by showing a retention of property, or an attempt to escape, by force or putting in fear."

In Montsdoca et al. v. State, 84 Fla. 82, 93 So. 157, 27 A. L. R. 1291, the court stated that it was essential that the violence or intimidation precede, or be contemporaneous with, the taking of the property. It appears in this case, that there was an assault on the victim and a forcible taking possession of his automobile, before he paid money to the defendants. The court held that the defendants were guilty of robbery.

Other leading cases on this subject, as cited in footnote 2, on page 148 of 46 Am. Jur., are: Gordon v. State, 125 Ark. 111, 187 S. W. 913, Ann. Cas. 1918A, 419; Colbey v. State, 46 Fla. 112, 35 So. 189, 110 Am. St. Rep. 87; Jackson v. State, 114 Ga. 826, 40 S. E. 1001, 88 Am. St. Rep. 60; State v. Lewis, 173 Iowa 643, 154 N. W. 432, Ann. Cas. 1918A, 403; Jones v. Commonwealth, 115 Ky. 592, 74 S. W. 263, 103 Am. St. Rep. 340; State v. Holmes, 317 Mo. 9, 295 S. W. 71, 58 A. L. R. 652; State v. Parker, 262 Mo. 169, 170 S. W. 1121, L. R. A. 1915C, 121; State v. John, 50 N. C. 163, 5 Jones Law 163, 69 Am. Dec. 777; Monaghan v. State, 10 Okl. Crim. 89, 134 P. 77, 46 L. R. A., N. S., 1149.

In the instant case the appellant, in his statement (State's exhibit 5), stated, as above quoted, in part as follows:

"I started to get into the car * * *. However, I noticed that he got up and started coming toward me.

\* \* \* When I saw McCollum coming after me, I reached into the *gove* compartment again and the first thing I found was a monkey wrench. I picked this up and hit him in the face several times with it. He fell down that time and stayed down. I recall that I hit him a number of times with the wrench but I don't recall how many. I wondered at the time where he got the resistance to take the beating that he was taking without falling down. *After McCollum fell down* the second time, I got into the car and drove toward Wendover, Utah." (Italics ours).

It is apparent that the beating of McCollum with the wrench occurred to overcome or prevent resistance to the taking of the car, not merely to accomplish flight. He stated he had started to get in the car, but it is evident he had not yet entered, or taken possession, when he saw McCollum coming toward him; that he changed his intention of immediately entering the car, and instead reached into the glove compartment, obtained the monkey wrench, and assaulted McCollum, and continued hitting him until he "fell down and stayed down." Only then, after the resistance of McCollum was overcome or prevented, did Sala take the automobile. By entering the car and taking possession of it, after the force and violence were thus used and completed, he thereby accomplished the taking or robbery. He then drove away. McCollum, due to the beatings, had become unconscious and helpless, and no force was needed or used by Sala to accomplish the flight. At that stage of the action there was no resistance.

■■ To constitute robbery, the taking, as in larceny, must have been with the specific intention to deprive the owner of his property (in the instant case, the automobile), permanently. In other words, there must exist, as an element of the crime, the specific intent to steal, or the animus furandi. 46 Am. Jur., sec. 10, p. 143. In the instant case, the existence of such intent is manifested by the subsequent acts of the appellant, as narrated

in his statement (State's exhibit 5) and as admitted therein.

A full discussion of the intent in larceny occurs in 32 Am. Jur., sec. 36 et seq., p. 925.

The 5th paragraph on page 2 of the appellant's said statement, and its continuation on page 3 thereof, together with the second paragraph on said page 3, discloses that Sala, notwithstanding his belief at the time of the assault that he would drive to Salt Lake City, drove to Wendover, Utah, and stopped at the Shell gasoline station. While he was getting gas for the car, a soldier came up and asked for a ride to Elko, Nevada. Sala said, in that connection, in his statement:

"I told him to come along and he went to sleep after we got started. I awakened him when we got to Elko but he told me that he wanted to go on to Reno. At road houses along the way the soldier, whose name I don't recall, and I stopped and had several drinks. At a warm springs station between Lovelock and Reno, the soldier and I stopped and had several drinks. I met a woman there who intorduced herself as Ethel. She told me that her car had broken down and that it was parked about 5 miles from the warms springs station. I told her that I would drive her down there so that she could get her personal belongings out of the car. I brought her and the soldier on into Sparks, Nevada with me because she said that she wanted to go on to Sacramento, California."

It is clear that Sala did not merely convert the car to his own use, intending to return it to McCollum, or leave it where McCollum would reasonably have an opportunity of reclaiming it. Indeed, in view of the beatings he had administered to McCollum, he had no reason to believe that McCollum would survive for any considerable length of time and be able to reclaim the car, or to receive its return. Sala had no fixed intention as to where he was going, when he drove the car away. The mere fact that a soldier came up to the gasoline

station at Wendover and asked for a ride to Elko, when Sala was getting gasoline, was sufficient to cause Sala to decide to go west instead of east from Wendover, and to Elko instead of Salt Lake City; and the fact that, when they arrived at Elko, the soldier wanted to go on to Reno, was sufficient to cause Sala to continue west from Elko. Then appellant met the girl, Ethel, at Warm Springs Station, between Lovelock and Reno, while he and the soldier stopped and had several drinks. After driving the girl back five miles, to where her car was broken down, in order to get her personal belongings, he "brought her and the soldier on into Sparks, Nevada, because she said that she wanted to go on to Sacramento, California." If he had not been apprehended and arrested in Sparks, Sala would probably have driven the girl on to Sacramento. He was driving the car wherever circumstances, or his fancy, suggested, and no consideration or thought of returning it to McCollum is indicated. It is clear, from the second paragraph on page 3 of his said statement, that he intended to steal the car, and considered it to be stolen. Said second paragraph is as follows:

"At no time during the trip from Wendover, Utah to Sparks, Nevada did I tell either the soldier or Ethel that the car I was driving was stolen."

Conceding the car to have been stolen, he assured the officers, in order to exculpate the soldier and Ethel from any connection with the crime, that he had at no time told them that it was stolen.

As to the element of the cause of death, it was sufficient if, from the evidence, it was proven that the injuries inflicted by the second series of beatings were of such a nature that, in their natural and probable consequence, they would produce death, or at least materially contribute to and accelerate same.

As stated in 26 Am. Jur., sec. 49, p. 192:

"The law declares that one who inflicts an injury on another and thereby accelerates his death shall be held

criminally responsible therefor. It is said in this connection that if any life at all is left in a human body, even the least spark, the extinguishment of it is as much homicide as the killing of the most vital being." State v. Francis, 152 S. C. 17, 149 S. E. 348, 70 A. L. R. 1133.

■ Dr. Rapp testified that there were at least three basal fractures of the skull, such as would be caused by a blunt instrument. The appellant, in his statement, admitted he hit McCollum many times in the face and head, with the monkey wrench, inflicting the second series of beatings, and that he finally "fell down and stayed down." McCollum was taken to the hospital, continued to become worse, and died September 12, five days after the beatings. Death was undoubtedly caused by the two series of beatings, but the second series, those with the monkey wrench, contributed materially to cause, and they undoubtedly accelerated, the death of McCollum. The injuries were of such nature, as in their natural and probable consequence, would produce such result.

■ In connection with the last series of beatings of McCollum by Sala, all the elements of a malicious and intentional killing of the deceased by the appellant, in the perpetration of robbery, were proven, by means of his admissions and by the other evidence adduced as to the surrounding facts and circumstances, sufficiently to justify the trial court in determining that the appellant was guilty of murder in the first degree. That being true, it is unessential for us to proceed further in order to justify such determination and the judgment and sentence of the district court. We feel, however, that to fail to make a definite finding and determination as to the first series of beatings, which appellant's counsel have so zealously insisted were done in the heat of irresistible passion, aroused by the provocation of improper advances, emanating from sexual perversion, would leave at least a cloud of suspicion upon the character of the deceased, which is only supported by the

uncorroborated assertion of the appellant, and which is refuted by its inherent improbability, arising not only from the inconsistency of appellant's story itself, but, also, from the strongly convincing indications which stem from the surrounding facts and circumstances, admitted in part by the appellant, and which are inconsistent with the probability of such improper advances having occurred.

As hereinbefore indicated, it is highly improbable that a third improper advance, of the character described, would have aroused anger so extreme as to cause the brutal, vicious assault and numerous severe blows with the hammer, notwithstanding the fact that, after the first advances had occurred, McCollum and Sala had drinks together and tried to get a room at the towns in which they stopped, and upon the occasion of the second advance, appellant went to sleep.

In appellant's statement, the third alleged advance and appellant's acts immediately following are described as follows:

"However, I went to sleep" (when the second advance was being made) "and when I awakened the car was stopped. McCollum was standing on my side of the car and was rubbing my chest and legs. I told him to get away from me and he told me to take it easy, that no one was going to hurt me. I told him to get away again and he didn't do it so I started to get out of the car. My hand fell on a ball pean hammer which was in the glove compartment. The glove compartment was standing open at the time. When McCollum didn't leave me alone, I hit him across the face with the head of the hammer. He put his hands to his head and started moaning and ran around to the other side of the car. I followed him around there and hit him several times with my fists. I then hit him several times with the hammer and he fell down." (Parenthesis ours.)

Assuming, for the moment, that the foregoing is literally true, all that appellant needed to do, to put an

end to this particular advance, was to get out of the car, which he did. He claims that McCollum was standing on his (Sala's) side of the car, rubbing his chest and legs. Evidently, according to Sala, McCollum was standing outside the car and was reaching in and indulging in the familiarity mentioned. There is nothing to show that more was needed, to prevent any repetition of such acts, than a firm statement from Sala that he would not tolerate any such conduct. But he claims irresistible passion was aroused, causing him to grab the hammer and hit McCollum in the face. Then McCollum ran around the car, moaning. If McCollum could be deemed the aggressor, by reason of the alleged advances, he definitely retired from the combat. Sala then became the aggressor, chased him around the car, hit him several times with his fists, and several times more with the hammer. Why the need to use a deadly weapon? He was thirty-seven years old, and McCollum was fifty-five years of age. Sala has never claimed McCollum was armed. If he wished to punish McCollum, for the alleged improper advances, why did he not use his fists alone. He had the great advantage of the difference of age, and, doubtless, of strength and endurance. Why the murderous assault with a deadly weapon, and the torture that must have accompanied the blows in the face and forehead with such a weapon? Why would rubbing his chest and legs arouse such great passion, when rubbing his leg just a little while before had no effect, and he went to sleep while it was being done? It is all too extreme and unreasonable to be worthy of belief.

Assuming that Sala had been asleep and was suddenly awakened and McCollum was making advances that were repulsive, the repetition of such conduct might have been disturbing, and a quick-tempered person, it may be readily surmised, may have become angry and struck McCollum, even have given him a beating with his fists. But why the impulse to destroy him, the cruel,

terrific blows with a deadly weapon, after the beating with his fists, as well as before? It doesn't make sense, in view of Sala's complacency and calm condition of mind upon the occasion of the first and second advances. But if we follow the old adage, "Actions speak louder than words," and take into consideration his subsequent actions, namely, the second series of beatings, in connection with the taking of the automobile, and the wanton cruelty and murderous intent clearly manifested by the circumstances which he has related in his statement, in connection with the second beatings, we thereby obtain a clear insight as to his character and method of operation. According to his story, as above related, he started to get in the car, believing he would drive to Salt Lake City, but just then he saw McCollum, whom he had only a short time before beaten into unconsciousness and dragged to the side of the road (as he stated, but, actually, into the bar pit), coming toward the car. He knew that McCollum, having been beaten so severely and so recently with the hammer, in the face and on the head, could offer little, if any, substantial resistance to the taking of the automobile, and that McCollum was unarmed. He could easily have driven the car away, practically without interference from McCollum. He did not see fit to do that. Indeed, if his story about the alleged improper advances prior to the first beatings were true, he, nevertheless, had he been possessed of any human compassion, would have regretted after the fit of temper had passed, that he had beaten and wounded McCollum so severely, and would have used the automobile to drive McCollum where he could obtain medical treatment, to try to save his life, and perhaps avoid a charge of murder against himself. If, however, he did not possess such compassion, or feared the consequences of his vicious assault and desired to avoid arrest, but was honest and had no thought of robbery, he would have had no occasion to indulge in the second series of beatings, but would have quietly left the scene and

endeavored to have 'hitch-hiked" to some place remote from the scene of the crime. But in his statement he acknowledged, in connection with the second beatings, the true motive—to rob McCollum of the automobile. As to the second series of beatings, there is no pretense of improper advances, or any provocation, by McCollum, or even substantial resistance. Notwithstanding the utter lack of provocation, or any reason, even in order to accomplish robbery, for any further beatings, and in spite of the fact that, in McCollum's wounded condition, further beating probably would result in his certain death, Sala, according to his statement, reached into the glove compartment again, found a monkey wrench, picked it up, and hit McCollum in the face several times with it.

Sala, at that point in his statement, said:

"He fell down that time and stayed down. * * * I wondered at the time where he got the resistance to take the beating that he was taking without falling down. After McCollum fell down the second time, I got into the car and drove toward Wendover, Utah."

Sala's own description of those beatings, together with the known facts and circumstances, reveal his real character as a robber-killer. Here is a man wounded and almost helpless, trying to reach his automobile, probably his only hope of being able to go some place for medical attention, and is cruelly stricken down after having been beaten time after time with the wrench. While the primary motive was robbery, the wanton, cruel severity of the beatings of a man in McCollum's condition, discloses craven cowardice, and the intent to kill McCollum to prevent his reporting this and the previous crime, and, probably, the blood thirst and lust of the killer.

In their conversation at Eureka, McCollum had told Sala (according to Sala's statement) that he had a thousand dollars with him. Sala had, no doubt, pondered upon that information, and, as they traveled along the

road in the darkness, had made up his mind to rob
McCollum of his money and his automobile.  He had
seen the black zipper wallet and the twenty-dollar bills
in it, when McCollum paid for the gasoline at the Miller
Service Station, in Ely, and, in view of McCollum's dis-
closure, in the conversation at Eureka, as to having a
thousand dollars with him, Sala, when he attacked
McCollum the first time, with the ball peen hammer,
doubtless believed McCollum had a great deal more
money somewhere on his person than appeared to be
contained in the black zipper wallet.  It is clearly appar-
ent that, in view of the wanton cruelty so clearly dis-
played in the later beatings with the wrench, a man of
Sala's nature and disposition required no provocation
and no motive, other than that of robbery, to cause him
to strike with cruelty and viciousness.  The pretense
that the first beatings, with the hammer, were caused by
any improper advances emanating from sexual perver-
sion, appears in its true perspective, in view of the later
actual disclosure by Sala of his real character, his
motive, and his method of operation.  Any such pretense,
in view of the subsequent clear disclosure afforded by
the circumstances accompanying the second beatings,
must be discarded as so fantastic and unreal as to be
totally unworthy of belief.

We may state, with the certainty of firm conviction,
that one so cruel and heartless as to strike and beat a
wounded, helpless man as ferociously as Sala acknowl-
edges he did McCollum with the monkey wrench, in
order to steal the car, when such force was clearly
unnecessary to enable him to accomplish that objective,
required no improper advances or other provocation,
nor any inducement or incentive other than the purpose
of robbery, to cause him a short time before to inflict
with the hammer the first beatings.  Indeed, there
appears far more reason, from the standpoint of rob-
bery, why greater force should have been used on the
occasion of the first beatings, than upon the occasion of

those which occurred later. In the matter of the first attack, upon a man fifty-five years of age and in normal condition, Sala doubtless expected considerable physical resistance; also, he had a greater objective, that is to rob him, not only of his automobile, but also of his money. Doubtless, also, he wished to force him to disclose the whereabouts of the money. At the time of the second attack and beatings, Sala had doubtless realized his purpose of obtaining the money had proven futile. With only a wounded and almost helpless man to resist him, and only the objective of taking the car, and when his actions at that time clearly reveal a calm, calculating condition of mind, free from anger or passion, he struck with great force, evidently intending the utter annihilation of his victim. This is a clear demonstration, as before stated, of his character and modus operandi. The first and second beatings were committed merely as parts of the execution of a plan or pattern, willfully, premeditatedly, and deliberately formed in the mind of Sala, after learning that the deceased had the one thousand dollars.

Other evidences of the plan and purpose of robbery being the actuating cause of the entire transaction, from the first blow with the hammer to the time Sala drove away in McCollum's automobile, were the rifling of the black zipper wallet, and the presence near the center of the oiled portion of the highway and very near a pool of dried blood, at the scene of the crime, and only a short distance from where McCollum was found, of a pair of pliers and a roll of adhesive tape. At the Miller Service Station, at Ely, the wallet contained a number of twenty-dollar bills. The witness Earl Ray Miller believed he saw five or six of such twenty-dollar bills when McCollum had his wallet out, paying for the gas. About two or three hours later, McCollum was found alone near the edge of the roadway, terribly beaten. Mr. John William Pratt, a highway employee, was the first to arrive at the scene, except some tourists whom Pratt had seen pass

the Boone Springs Station a very short time before he left there. As to that matter, the testimony of Mr. Pratt was as follows:

"I know they hadn't been there very long, because they had just left the station as I was pulling out, ahead of me.

"Q. How far ahead of you? A. I imagine about a half a mile ahead of me.

"Q. And they had stopped and were moving around the scene when you arrived? A. Yes."

Mr. Pratt testified, also, it took him about five minutes to travel from Boone Springs the five miles to the scene of the crime. He evidently traveled about sixty miles an hour. If the tourists were traveling at an equal rate of speed, they would have been at the point where Mr. Pratt found them, when he arrived, about one half a minute.

There is no evidence that anyone other than these tourists had been there before Mr. Pratt arrived and after the beatings of McCollum, and the tourists were not there a sufficient length of time to have had any opportunity to search McCollum and find the wallet. The half minute, or so, they were there, most likely, was spent in trying to ascertain the condition of McCollum and what had happened to him. Two men, Mr. Gardner and Mr. Wreck, were with Mr. Pratt, and Mr. Pratt took the wallet from McCollum and kept it until the officers arrived, according to his testimony. McCollum, in Pratt's presence, soon after Pratt's arrival, had taken the wallet from his back trousers pocket. Pratt testified he (Pratt) took nothing from the wallet. When the officers arrived, according to the testimony of Bryan Robison, deputy sheriff, they found the wallet empty. McCollum was fumbling with it, in his hand. Pratt, after discovering McCollum alongside the road and viewing the situation, took the wallet for safe-keeping, before he went to report, by telephone, to the sheriff's office at Ely, as to the finding of McCollum. As between

Sala and Pratt, it is most probable that Sala, at some time during or between the blows of the first beatings, took the money from the black zipper wallet.

The testimony of Tom Williams, by which the defense sought to prove that Sala, during his trip from the scene of the crime, and until his arrival that night at Sparks, Nevada, had expended no unusual amounts of money, carries little weight, circumstantially, to disprove the taking of the money from the wallet. Williams testified that he visited, in making his investigation, only Eureka, Ely, Wendover, Carlin, Battle Mountain and Golconda. There were numerous other towns, service stations, roadhouses and other places where Sala may have stopped and expended money. In answer to defendant's attorney, Mr. Wines, who asked for the answer, even though the witness said his information was hearsay, Mr. Williams said that an officer from Reno had stated to him that Sala had expended at Springer's Hot Springs twenty-five or thirty dollars. He had $9.35 when arrested, and probably about ten dollars was required for food and gasoline and oil on the trip. The total expenditures, based on that information, would be about forty-five or fifty dollars. Sala, in his statement, said that:

"At road houses along the way the soldier, whose name I don't recall, and I stopped and had several drinks. At a warm springs station between Lovelock and Reno, the soldier and I stopped and had several drinks. I met a woman there who intorduced herself as Ethel. She told me that her car had broken down and that it was parked about 5 miles from the warms springs station. I told her that I would drive her down there so that she could get her personal belongings out of the car. I brought her and the soldier on into Sparks, Nevada with me because she said that she wanted to go on to Sacramento, California."

No one kept any check at these various stopping places as to how much Sala expended. He may readily, at the

places where he stopped for drinks, have expended another twenty-five dollars or thirty dollars, or more. If there were four twenty-dollar bills in the wallet (and Mr. Miller in his testimony, did not claim to know exactly how many there were), the expenditure of thirty dollars in addition to the amounts mentioned above would have accounted for the eighty dollars.

■ We believe it was sufficiently established that the taking of the money from the black zipper wallet was by Sala, and was part of the robbery he perpetrated upon McCollum, and that the blows comprising the first series of beatings were immediately preceding, or concomitant or contemporaneous with, the rifling of this wallet.

The presence on the highway, near a large spot of blood, of the pliers and roll of adhesive tape is an item of circumstantial evidence indicative of robbery.

■ The evidence is that Sala failed to find the bill fold of the envelope type which the deceased had secreted between his undershirt and his outer shirt, down next to his belt, in which were the traveler's checks and more than three hundred dollars in currency. This bill fold, the money therein amounting to $300 or $310, and the traveler's checks, were found at the hospital, by the doctors and nurses, when McCollum was undressed, shortly after he was brought there by Dr. Rapp and the officers.

McCollum had told Sala he had one thousand dollars, as above stated. It is reasonable to believe, therefore, that Sala's principal objective was to obtain that money and the automobile. It is probable that the pliers and tape were found in the car by Sala, and that he placed them on the highway at some time during the period of the first beatings. They were directly alongside a large spot of blood, indicating a connection with the activities which took place there. They would doubtless have been seen by passing motorists, if they had been there for any considerable length of time, and, having some value and utility, would have been picked up. It is

very probable that Sala, at some time or times while the first beatings were being administered, made a determined effort to find the larger amount of money, that he was unable to do so, and that he employed all available means of duress and coercion to compel McCollum to disclose its whereabouts. That probably accounts, in part, for the fact that repeated blows were struck (according to Sala's statement) with the hammer, after the first beating with the hammer, then with the fists. At some stage of the beatings, Sala probably obtained the pliers and tape and threatened to bind McCollum and tie him up and leave him helpless on the desert, down in the bar pit, where he could not easily be observed, unless he told him where the money was. The presence of the oil can and matches off in the bar pit, about sixty-one feet away from the point to which McCollum evidently had been dragged after the first beatings were completed, was more remote, and while their presence there has some evidentiary relevancy, the weight of this item of evidence is slight. The fact that Sala failed to find the principal receptacle containing money, in view of where it was secreted, is not surprising, and in no sense, in view of the other evidence and the surrounding circumstances, negatives the existence of the intent to rob, and the fact that the beatings were inflicted in the perpetration of robbery. Indeed, the very severity of the first beatings, continued until the handle of the ball peen hammer was broken, indicates that appellant was trying to torture McCollum into disclosing the whereabouts of the money. Sala does not claim McCollum was armed, and he could certainly have accomplished the taking of the money from the black zipper wallet without continued beatings to the degree of such extreme severity. Furthermore, the fact that Sala left the deceased's wrist watch on his wrist, and his coin purse, in which there was about six dollars, in his pocket, does not, in the light of the other evidence and the circumstances, negative the intention of robbery. It

must be borne in mind that Sala had much reason to be in a hurry. The scene of the crime was on, and immediately adjacent to, a much traveled highway, U. S. highway No. 50. By the time Sala had spent some time beating McCollum, which was, no doubt, prolonged while he was endeavoring to torture him into disclosing where the money was, Sala, no doubt, was becoming "jittery" and anxious to flee. Naturally, when he had failed to find the larger part of the money, his next thought was the automobile, the stealing of which was, no doubt, one of his principal objectives from the inception of his plan. He had no time to tarry to bother with the coin purse and the wrist watch.

From the standpoint of the robber-killer (and we believe we can conceive, in a measure, his condition of mind, under the then existing circumstances), the extreme severity of the second beatings, for which there seems, as above indicated, to have been no reason, because of the apparent helplessness of McCollum, was probably, in part, the result of the "jittery" condition of the nerves of Sala. He had, most likely, been delayed while trying to compel McCollum to tell him where the money was, and when he started to enter the automobile, believing he would drive to Salt Lake City, he had, as he believed, sufficiently disposed of McCollum, by leaving him, unconscious, in the bar pit along the highway. Then he was surprised to see that McCollum had regained consciousness and was coming toward him. This meant further delay and annoyance. So, primarily to accomplish the robbery of the automobile, but also partly, no doubt, in a spirit of hatred or resentment because McCollum had withheld information as to the whereabouts of the money, and in part through fear of detection unless he quickly silenced McCollum so he could not report the crime, and partly in resentment that McCollum was on his feet and coming toward him, which meant further delay, he struck McCollum violently, repeatedly, and rapidly, with the wrench. That he coldly calculated the effect of each blow, is apparent

from his statement, in which he said that he wondered at the time where he got the resistance to take the beating that he was taking without falling down.

The circumstances and the severity of both these series of beatings each with a deadly weapon reasonably calculated to produce death, and their repetition to the extent that there were three basal fractures of the skull, reasonably lead to the conclusion that there was malice, both express and implied. Sala deliberately intended unlawfully to take away the life of McCollum, and such intent is manifested by external circumstances capable of proof.

The robber-killer, of the type Sala has shown himself to be, will kill an individual deliberately, and without provocation, when, as in the perpetration of robbery, he conceives it to be to his interest to do so. Sometimes it is due to physical cowardice, to avoid possible physical injury to himself, and sometimes due to moral cowardice, to avoid detection and the just punishment which he realizes he deserves.

Such a robber-killer has developed an abandoned and malignant heart to such a degree that he conceives all decent members of society as his potential enemies, to be robbed and to be killed with impunity, if such killing, in his conception, becomes expedient. It is only a step from the evil covetousness or greed of the robber to the blood lust of the killer, and often they coexist in the same depraved mind.

After a careful consideration of all the evidence in the instant case, we are impelled to the conclusion that the evidence and the law abundantly sustain the action of the district court in its determination that the appellant is guilty of murder in the first degree, and that said court did not abuse its discretion in so determining. The corpus delicti and all other essential elements of the crime of first degree murder were proven, by competent evidence, beyond a reasonable doubt. There is, therefore, no merit in appellant's exception No. 1.

Upon the conviction of a person of murder in

the first degree, upon a plea of guilty to the crime of murder and the determination of the district court that the crime is murder in the first degree, the discretion is vested in the trial court to prescribe the punishment. In this case the district court has pronounced the judgment and sentence of death as the punishment for the crime of which the defendant has been duly convicted upon his plea of guilty and the determination of the trial court that the crime is murder in the first degree. The district court, in pronouncing such judgment and sentence, did not abuse that court's discretion.

No error appearing in the record, the order of determination of the district court determining the crime of appellant to be murder in the first degree and the judgment appealed from are affirmed, and the district court is directed to fix the time of and to make the proper order for the carrying into effect, by the warden of the state prison, the judgment rendered.