# HENRY DEUTSCHER, Appellant, v. THE STATE OF NEVADA, Respondent.

## No. 10434

October 18, 1979           601 P.2d 407

*Morgan D. Harris,* Clark County Public Defender, and *Herbert F. Ahlswede,* Deputy Public Defender, Clark County, for Appellant.

*Richard Bryan,* Attorney General, Carson City; *Robert Miller,* District Attorney, and *Ray Jeffers,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, Manoukian, J.:

This appeal is from felony convictions of first degree murder, NRS 200.010 and 200.030, and robbery without the use of a deadly weapon, NRS 200.380, resulting in a death sentence and a consecutive fifteen-year penalty respectively.

Appellant proffers several bases for reversal contending that (1) Nevada's capital punishment statutes are constitutionally infirm; (2) the trial court erred in instructing the jury that it could consider an aggravating circumstance absent respondent's failure to give statutory notice of the circumstance prior to the penalty hearing; (3) his pre-arraignment inculpatory statements made during detention were improperly admitted; (4) probable cause for the arrest was lacking making inadmissible evidence obtained incident thereto; (5) his fifth amendment right to silence was violated due to witness and prosecutorial misconduct; (6) prejudicial privileged and hearsay evidence should not have been admitted; (7) the trial court erred in its refusal to order a police officer to disclose his home address; (8) the evidence is insufficient to support the sentencing jury's findings of aggravating circumstances as required by NRS 177.055; (9) the trial court was without jurisdiction to proceed with the penalty hearing; and (10) error was committed when the trial court, during the penalty proceeding,

instructed the jury using an obsolete statutory term. We find no reversible error and affirm.

On the morning of August 16, 1977, the body of Darlene Joyce Miller, 37, was discovered on a desert road off North Nellis Boulevard behind Weaver Construction Company in Las Vegas. Her white 1976 Cadillac with Texas license plates was parked nearby. She was nude except for a blouse and bra that had been pulled open around her shoulders. Her legs were spread apart and there was smeared blood between her upper thighs. She had superficial lacerations and abrasions on her breasts and abdomen which experts testified represented bite marks. Her neck, face and head were severely bruised, bearing extensive abrasive-type injuries. Her head had a large depression skull fracture two and three-fourths inches in diameter caused by a crushing or blunt type object. A trail of dripped blood led from the crime scene to nearby North Nellis Boulevard, an arterial highway.

Sergeant Samolovitch of the Las Vegas Metropolitan Police Department, the officer in charge of the investigation, was informed by another officer that the victim's car had been parked the previous night approximately one-half mile away in front of the Wagon Wheel Bar on Nellis Boulevard. Upon questioning the bar owner, it was determined that the appellant had been seen with the victim in her automobile, leaving the bar at 2:00 a.m. the morning of August 16, 1977. Appellant was also seen in the vicinity of the bar by his former employer at approximately 6:00 a.m. The victim's body was discovered that morning at 6:30 a.m.

Appellant resided at a motel, also on Nellis Boulevard, which was located approximately one-half mile from both the bar and crime scene. After speaking with appellant's wife at the motel, the investigators went to Deutscher's place of employment to question him. Arriving at about 10:00 a.m., Sergeant Samolovitch noticed a ragged, fresh cut on Deutscher's hand and observed that he appeared nervous, cold and clammy. Sergeant Samolovitch advised appellant that he was under arrest for murder and gave him the *Miranda* warning.[1]

Deutscher was taken to the police station where he was again advised of his rights and signed a rights advisory card. Appellant was then questioned by the police; he admitted being in the victim's car, but initially denied any responsibility for the murder. When Deutscher was asked if he had any money he took out his wallet and removed two fifty dollar bills. The two bills

---

[1]Miranda v. Arizona, 384 U.S. 436, 478–79 (1966).

appeared to be stained with blood. When asked how the money became stained, appellant did not respond.

After Deutscher was transported to the Clark County Jail on August 16, he was fingerprinted and also consented in writing to a search in the form of dental impressions. Blood samples and fingernail scrapings were also obtained from him.

During a brief interrogation on August 18, 1977, Deutscher admitted killing the victim, but because he wanted to see his wife before making a full statement, the interview was interrupted and his wife was called. After speaking with his wife, a video taped statement was taken that afternoon with Deutscher, his wife, and several officers present. In this statement, appellant admitted having beaten the victim, describing the crimes in detail.

Appellant had been in custody from 10:00 a.m. Monday, August 16, the date of the offense, until 4:00 p.m. Wednesday, August 18, when the incriminating statement was given. He was arraigned before a magistrate on August 22.

Pertinent evidence at trial included Deutscher's fingerprints in the victim's car, blood of the victim's blood type under the appellant's fingernails, blood at the crime scene of both the victim's and Deutscher's blood type, and identification of the bite marks on the victim as being made by the appellant's teeth. The victim's husband testified that his wife had been carrying two fifty dollar bills, along with other smaller bills in her purse. The two larger bills were not in her purse when the body was found. The appellant's clothes and boots were located by police as a result of his confession, and the size, shape and sole pattern of the boots were consistent with those impressions taken at the crime scene. Deutscher's pants, undershorts, and shirt were stained with human blood.

A forensic pathologist testified as to the extent of injuries which the victim incurred, finding no evidence of recent sexual intercourse. The expert did testify that the victim had been strangled and that all the injuries were inflicted while the victim was still alive with the blow causing the two and three-fourths inch diameter hole to the left side of her head being the last and probable "lethal" injury.

Prior to trial, the state served upon the appellant a Notice of Intent to Seek Death Penalty, setting forth certain aggravating circumstances. These aggravating circumstances did not include the circumstance that the appellant had committed murder in an attempt to commit a sexual assault.

The jury found the appellant guilty of first degree murder and robbery. A penalty hearing was held and the jury was

instructed on what they might consider as aggravating and mitigating circumstances in determining the penalty.[2] Over appellant's objection, an instruction was given which provided that the jury could consider the attempt to commit a sexual assault an aggravating circumstance.

The jury concluded that (1) the murder was committed by appellant who was previously convicted of a felony involving the use or threat of violence to the person of another;[3] (2) the murder was committed while the appellant was engaged in the commission of or an attempt to commit any forcible sexual assault; and (3) the murder involved torture, depravity of mind, or the mutilation of the victim. No mitigating circumstances were designated, the jury simply determining that they did not outweigh the aggravating circumstances.[4]

### 1. The Death Penalty.

Appellant contends that the death penalty statute is unconstitutionally vague and therefore violative of due process and equal protection as the sentencing procedure permits juries untrammeled discretion in imposing death sentences. *See* Furman v. Georgia, 408 U.S. 238 (1972).

Nevada's capital punishment law was amended in 1977 with inconsequential revision from the death penalty statutes in Georgia and Florida. Georgia and Florida statutes survived constitutional scrutiny by the United States Supreme Court and satisfied the constitutional deficiencies enunciated in *Furman*. Gregg v. Georgia, 428 U.S. 153, 196–207 (1976); Proffitt v. Florida, 428 U.S. 242, 251–53 (1976).

Confronted by an eighth amendment challenge, we have recently held that Nevada's death penalty statutes (NRS 175.552–.562) are constitutional because they "provide for a consideration of any mitigating factor the defendant may want

---

[2]In this factual context Nevada law provides that the penalty panel may return verdicts of death, or life with or without the possibility of parole. NRS 200.030(4).

[3]The previous felony conviction was for attempted sodomy and assault in the second degree, filed in Suffolk County, New York, October 23, 1968.

[4]At the hearings during the penalty phase, the prosecution introduced the testimony of three witnesses. When the state rested, the court inquired of defense counsel whether there were "any mitigation witnesses at this time other than the evidence that was evidenced in the trial?" Counsel replied there were not and rested. The only mitigating factor to which counsel referred in closing was conclusory—namely, that the murder was committed while the appellant was under the influence of extreme mental or emotional disturbance. The argument was that the acts were the product of a diseased mind in that they were so brutal.

to present." Bishop v. State, 95 Nev. 511, 597 P.2d 273, 277 (1979). *See also* Gregg v. Georgia, 428 U.S. at 196–97; Proffitt v. Florida, 428 U.S. at 257–58; Shuman v. State, 94 Nev. 265, 578 P.2d 1183 (1978).

The appellant further contends that the death penalty statute is impermissibly vague because an aggravating circumstance for imposition of the death penalty is that "[t]he murder involved torture, depravity of the mind, or mutilation of the victim." NRS 200.033(8). These claims were not presented for review in *Bishop* or *Shuman;* however, similar aggravating circumstances would provide adequate guidance to the jury. In the instant case, we find the legislative enactment to be plain and intelligible. *See* Sheriff v. Smith, 91 Nev. 729, 542 P.2d 440 (1975). Moreover, the district court meticulously defined for the sentencing panel, the terms "torture," "depravity," and "multilation"[5] and the jury was therefore provided adequate guidance for the application of the aggravating circumstances. Gregg v. Georgia, 428 U.S. at 196–97; Proffitt v. Florida, 428 U.S. at 257–58. Moreover, it is well settled that statutes are entitled to all presumptions in favor of validity. Cummings v. City of Las Vegas Mun. Corp., 88 Nev. 479, 481, 499 P.2d 650, 652 (1972). We find no error.

---

[5]Instruction No. 21:

The essential elements of murder by means of torture are (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, persuasion or for any other sadistic purpose.

The crime of murder by torture does not nesessarily require any proof that the defendant intended to kill the deceased nor does it necessarily require any proof that the deceased suffered pain.

Instruction No. 22:

The condition of mind described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind outrageously, wantonly vile, horrible or inhuman.

Instruction No. 23:

You are instructed that the term "mutilate" means to cut off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to make imperfect.

## 2. Sexual Assault as an Aggravating Circumstance.

The appellant contends that the respondent should have formally notified him, under the provisions of NRS 175.552,[6] that murder committed in the perpetration of a sexual assault would be offered as an aggravating circumstance at the penalty hearing.

We believe that the purpose of the statute is to provide the accused notice and to insure due process so he can meet any new evidence which may be presented during the penalty hearing. Here, evidence was admitted at trial which showed the aggravated nature of the crime committed. The appellant was thus afforded ample notice regarding elements and proof of the offense itself when these were offered during the guilt phase. Eberheart v. State, 206 S.E.2d 12, 17 (Ga. 1974). The notice provisions of the statute were plainly not offended by the admission of the challenged evidence relating to the aggravating circumstance as the sexual assault was germane to the proof of the crime itself. Furthermore, an instruction regarding sexual assault was given at trial. The accused need not be independently informed of the intended use of this factor during the sentencing hearing. Hooks v. State, 210 S.E.2d 668, 670 (Ga., 1974); Eberheart v. State, 206 S.E.2d at 17; NRS 175.554(1).

## 3. The Inculpatory Statements Made During Pre-Arraignment Detention.

Appellant next contends that his incriminating statements given to police are inadmissible because, although they were given after his arrest, they preceded his arraignment. Our statutory scheme has long provided that an accused must be taken before a magistrate "without unnecessary delay." NRS 171.178. But while this court has recognized the statutory requirement, we have also held that in the absence of a statutorily-fixed period of time, a reasonable time is presumed

---

[6]NRS 175.552 provides:

The state may introduce evidence of additional aggravating circumstances as set forth in NRS 200.033, *other than the aggravating nature of the offense itself,* only if it has been disclosed to the defendant before the commencement of the penalty hearing. (Emphasis added.)

before an arraignment must be conducted.[7] Tellis v. Sheriff, 85 Nev. 557, 560, 459 P.2d 364, 365 (1969). And the mere passage of time, in the absence of prejudice to the defendant, does not constitute a deprivation of a defendant's rights. *Id*. Appellant was held in custody six days before his arraignment; however, he confessed to the crime after two and one-half days of detention. We find no prejudice as appellant was constantly advised of his rights and acknowledged that he understood them.

In McNabb v. United States, 318 U.S. 332 (1942), and Mallory v. United States, 354 U.S. 449 (1957), confessions which resulted from an unreasonable pre-arraignment detention were excluded because the confessions resulted from a flagrant disregard of federal procedure. Although we are not bound by these decisions which deal with federal criminal procedure, it is clear that they were intended to avoid the adhesive practices which would spawn from administrative detention without judicial examination. Culombe v. Connecticut, 367 U.S. 568, 584–85 (1960). It has been held, however, that these fears are not valid when an accused, as here, makes a voluntary confession after being fully informed of his *Miranda* rights. Appellant was informed of his *Miranda* rights on several occasions prior to his confession, signed a waiver card and acknowledged that he fully understood the import of the waiver. Moreover, the *Miranda* warning was amplified by the L.V.M.P.D. detectives as follows:

> I advised Mr. Deutscher that he had the right to remain silent; that anything he said could and would be used against him in a court of law; that he had a right to an attorney; if he could not afford one, one would be provided for him free of charge before any questioning.
> I also advised him that if he agreed to talk to us, at any

[7]In 1979, the Nevada Legislature amended NRS 171.178 and provided for a hearing if an arrested person is not brought before a magistrate within seventy-two hours after arrest. At that time, it will be determined whether a defendant *may* be released if the person "was not brought before a magistrate without unnecessary delay." 1979 Nev. Stats. ch. 589, §1, at 1191. Although not applicable to this case, the amendment demonstrates that no fixed time is necessarily prejudicial. Additionally, appellant here, fully informed of his rights, confessed within seventy-two hours of his arrest. No other evidence was obtained from appellant prior to the arraignment and subsequent to these statements.

It is noteworthy that by the time of the trial of this proceeding, Clark County had established the position of intake officer who has the responsibility of assisting an accused detainee by advising him of his various constitutional and legal rights. This includes information as to bail and "anything that would help them to appear in court, and they give them the date of their arraignment when they're to appear in Justice Court, and they fill out this sheet which helps determine if they need an attorney or public defender . . . ."

time during that interview he wished to revoke those rights, he had a right also to do that.

Asked him if he understood what I was telling him, that he understood these rights, and he indicated in the affirmative.

Additionally, the several interrogations were of reasonable duration, conducted in a reasonable atmosphere and no irregularities were discernible from the record.

We subscribe to the rule of law which provides that when an accused voluntarily waives his right to silence and his right to counsel, he concurrently waives his right to be seasonably arraigned. United States v. Indian Boy X, 565 F.2d 585, 591 (9th Cir. 1977), cert. denied, 439 U.S. 841 (1978); United States v. Woods, 468 F.2d 1024, 1026 (9th Cir. 1972), cert. denied, 409 U.S. 1045 (1972); Pettyjohn v. United States, 419 F.2d 651, 655–56 (D.C. Cir. 1969), cert. denied, 397 U.S. 1058 (1970). The reason for this rule is that the primary purpose of an arraignment is to inform the defendant of his rights. But a delay in arraignment is not prejudicial when a defendant has already been advised of his rights, was promptly so advised, and voluntarily waived those rights. See Pettyjohn v. United States, 419 F.2d at 655–56. This is particularly so when the delay is not flagrant and the record is silent relative to any other irregularities which go to the issue of voluntariness. Cf. McNabb v. United States, 318 U.S. at 334–38 (in which defendants in a custodial setting, were interrogated for periods of time in discomfort and without counsel and advice as to the right to counsel; confessions held inadmissible).

Because the voluntary nature of a confession is the primary test for admissibility, State v. Boudreau, 67 Nev. 36, 46, 214 P.2d 135, 141 (1950), we now focus on whether the pre-arraignment delay affected the voluntariness of appellant's confession. The appellant only feebly challenges voluntariness here. In reviewing the particular circumstances gleaned from the record surrounding the statements and resulting confession, including the education, experience and conduct of the accused, as well as the credibility of the police officers, it is patent that the waivers were voluntary. The subsequent delay in arraignment did not retroactively result in prejudice so that appellant's rights were violated. Morgan v. Sheriff, 92 Nev. 544, 546, 554 P.2d 733, 735 (1976); Brown v. Justice's Court, 83 Nev. 272, 276, 428 P.2d 376, 378 (1967).

### 4. *Probable Cause.*

The challenge by appellant of the existence of probable cause for his arrest is also without merit. Probable cause to arrest exists where the facts and circumstances within the officer's knowledge at the time of arrest would warrant a prudent person in entertaining an honest and strong suspicion that the person arrested has committed a crime. Brinegar v. United States, 338 U.S. 160, 175-76 (1949); Gordon v. State, 83 Nev. 177, 179, 426 P.2d 424, 425 (1967); Schnepp v. State, 82 Nev. 257, 260, 415 P.2d 619, 621 (1966). The presence or absence of probable cause is determined in light of all the circumstances and can include conduct of the defendant in the presence of the police officers. A Minor v. State, 91 Nev. 456, 462, 537 P.2d 477, 481 (1975); Schnepp v. State, 82 Nev. at 260, 415 P.2d at 621.

Sergeant Samolovitch testified as to the factual basis upon which his decision to arrest was made: (1) The appellant was seen leaving the Wagon Wheel Bar with the victim the morning of the crime in a car found close to the scene; (2) He knew Deutscher resided at a motel which was close to the bar and the crime scene; (3) A trail of dripped blood led away from the crime scene to Nellis Boulevard; (4) He observed a fresh cut on appellant's finger when he approached him at his place of employment the morning of the crime; and (5) The appellant appeared very nervous, cold, and clammy when he was approached by the officer. It is arguable that each of these circumstances, when taken by themselves, is consistent with innocence. But here, the cumulative suspicion produced by the totality of the circumstances warranted the finding by the lower court of probable cause to arrest. A Minor v. State, 91 Nev. at 462, 537 P.2d at 480; Schnepp v. State, 82 Nev. at 260-61; 415 P.2d at 621.

### 5. *The Defendant's Fifth Amendment Right to Remain Silent.*

Appellant claims there were two occasions during the trial where his fifth amendment right to remain silent was violated. He asserts the first error occurred during Detective Levos' testimony concerning the red-stained fifty dollar bills found in appellant's possession upon which the appellant refused to comment. Following timely objection, the jury was admonished to disregard the testimony.

■■■ ■ ■

Although a comment on a failure to respond can be reversible error, the comment must be more than a mere passing reference and an accused must be prejudiced by the remark to mandate reversal. Shepp v. State, 87 Nev. 179, 181, 484 P.2d 563, 564 (1971); *see* Layton v. State, 87 Nev. 598, 600, 491 P.2d 45, 47 (1971). Clearly, this was not a purposeful comment by the prosecutor. *Cf.* Layton v. State, 87 Nev. at 600, 491 P.2d at 47 (prosecutor made prejudicial comment in closing argument respecting defendant's silence). The comment here was by a witness and was a supplemental comment to the answer already given.[8] Considering the vague, passing nature of the remark, coupled with the admonishment, no prejudice to the appellant is shown. Layton v. State, 87 Nev. at 600, 491 P.2d at 47; Shepp v. State, 87 Nev. at 181, 484 P.2d at 564.

■■■ ■ ■

The second comment occurred during the prosecutor's final argument when he said, "[The defendant] testified he then—excuse me. He stated during the video interview . . . ." This vague reference to the appellant's confession cannot be construed as a direct reference to his failure to testify. Layton v. State, 87 Nev. at 600, 491 P.2d at 47. The established test is whether the language was "manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to [respond]." Knowles v. United States, 224 F.2d 168, 170 (10th Cir. 1955). This non-deliberate, self-corrected statement by the prosecutor does not constitute a sufficient comment to mandate reversal. *See* Sanchez v. Heggie, 531 F.2d 964 (10th Cir. 1976).

---

[8]The deputy district attorney was questioning Detective Levos regarding his interview of the appellant:

"Q. Did you ask him how the stains got on the two fifty dollar bills?

"A. I did.

"Q. What did you ask him in that regard?

"A. I asked him—I said, 'Then where did the stains from—on the money come from?'

"He didn't answer me."

Defense counsel made an objection, following which the reference to defendant's silence was stricken and the jury admonished. It should be noted, however, that the appellant previously had stated he waived his rights and was willing to give a statement to the police. He had given a statement, responded that he did have money and attempted to explain how he got it. When Detective Levos asked about the stains, the appellant did not answer. Detective Levos' comment at trial was in passing and was a description of all the circumstances. The comment by the police officer here was also not emphasized by the prosecutor.

The final remark, which was made during the state's closing argument, was, "He can sit there and not open his mouth." Our review shows that this remark was in the context of a discussion of the state's burden of proof. Even though the remark may be improper when taken in context, it becomes inconsequential when, as here, the verdicts are free from doubt. Dearman v. State, 93 Nev. 364, 369, 566 P.2d 407, 410 (1977). The error, if any, on this record of guilt, is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 21–24 (1967).

*6. The Hearsay and Privileged Statements.*

Appellant contends that inadmissible evidence was admitted during the jury's hearing of a portion of the video taped statement. The challenged testimony consists of remarks by Detective Levos during the video interrogation regarding comments appellant's wife made to police officers.[9] The appellant asserts that the statements are inadmissible because they are privileged spousal communications, as well as hearsay.

Appellant contends that the officer is placing testimony before the jury indirectly when the wife could not testify against her husband. The spousal privilege,[10] however, is intended to protect confidential communications between spouses, not communications between a spouse and third parties. Foss v. State, 92 Nev. 163, 167–68, 547 P.2d 688, 691 (1976). The privilege cannot be applied to protect communications disclosed, as here, by strangers. State v. Lindley, 502 P.2d 390, 392 (Or.App. 1972).

Hearsay evidence is evidence of a statement made other than by a witness while testifying at the hearing, which is offered to

---

[9]The testimony was:

Henry, I interviewed your wife on the morning of the 16th, and I don't think she was lying to me, but she told me that she hadn't seen you since about 9:30 or 9:45 the night before, when you came home from your mother's. You got a ride home from your mother's, and she went to bed and you went out. She told me that she did not see you since.

[10]NRS 49.295 (1) provides in pertinent part:

(a) A husband cannot be examined as a witness for or against his wife without her consent, nor a wife for or against her husband without his consent.

(b) Neither a husband nor a wife can be examined, during the marriage or afterwards, without the consent of the other, as to any communication made by one to the other during the marriage.

prove the truth of the matter asserted. NRS 51.035. It is inadmissible unless it comes within an exception. NRS 51.065. Respondent argues that the statements made by the police officer in the video taped interview concerning what appellant's wife had said were not admitted to prove the truth of what the wife had said. Without citing authority, the state contends that the officer's statements ''were merely relevant to setting the scene and establishing the circumstances under which the defendant's incriminating statement evolved. It was the statement of the defendant, and not the officer's statements to the defendant, which was offered into evidence.'' We cannot agree with the state based on the record before us.

Traditionally, hearsay evidence has been excluded because it is not subject to the usual tests to show the credibility of the declarant. Lacking is cross-examination to ascertain a declarant's perception, memory and truthfulness. Moore v. United States, 429 U.S. 20, 21–22 (1976) (per curiam); Donnelly v. United States, 228 U.S. 243, 273 (1913). The same problems are present here as to two declarants. First, it is the officer on a video tape making a statement as to what he was told by appellant's wife. Second, the wife has allegedly made certain statements as to appellant's whereabouts on the night of the murder. Appellant's wife was not subject to cross-examination to discover if she indeed said this or as to her memory. Although the officer could have been questioned as to the accuracy of his recollection, it is apparent he was basing his knowledge of appellant's whereabouts upon what someone else had informed him. This is inadmissible hearsay. Toti Contracting Co. v. A. J. Orlando Contracting Co., 181 A.2d 594, 596 (Conn. 1962). Indeed, both of these statements were hearsay. See Archibald v. State, 77 Nev. 301, 307, 362 P.2d 721, 723–24 (1961); Cf. Alexander v. State, 84 Nev. 737, 449 P.2d 153 (1968) (defendant's testimony as to what a friend had said was hearsay). Together, these statements constituted multiple hearsay.

We perceive no hearsay exceptions to what appellant's wife said, let alone what the officer has stated. See NRS 51.065–.375. Additionally, it cannot seriously be argued that the purpose was only to show that the statements were made or conversation had or that they were to show the circumstances of appellant's statements. The officer had even said to the appellant, ''Henry, your wife is present in the room. . . . Are you going to make a liar out of her?'' If the purpose of these statements was merely to show the surrounding circumstances, we believe they would have been irrelevant. The statements by

appellant himself could have and should have been admitted by themselves.

We must now determine whether the admission of these hearsay statements was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 21–24 (1967); Drummond v. State, 86 Nev. 4, 8–9, 462 P.2d 1012, 1015 (1970); NRS 177.255, 178.598. We note that whether or not appellant's wife did in fact make the statements, there is other uncontradicted evidence placing the appellant at the Wagon Wheel Bar after midnight. Appellant was seen leaving the bar with the victim at approximately 2 a.m. and he was seen near the bar and not far from the murder scene at 6 a.m., shortly before the body of the victim was discovered. In addition, there is overwhelming evidence of appellant's guilt as shown by appellant's possession of two blood-stained fifty dollar bills and testimony by the victim's husband that the victim had two fifty dollar bills on her person before she was killed. The appellant appeared to have been in need of money; he was quite familiar with the scene of the crimes and entire area whereas the victim was not; there were bootmarks at the scene which matched boots appellant had discarded and an expert testified that the bite marks on the victim were made by appellant. Moreover, blood found at the scene matched the blood-type of the appellant and the blood in the fingernail scrapings taken from appellant was of the same blood type as that of the victim.

All of this is extremely convincing even without regard to appellant's confession or the statement of appellant's wife.[11] While these statements by the wife should have been excluded, we hold that the error was harmless beyond a reasonable doubt as there was other undisputed inculpatory evidence concerning appellant's whereabouts on the night in question, cf. State v. Rover, 13 Nev. 17, 24–25 (1878) (Beatty, J., concurring) (admission of evidence not harmful where other evidence already established fact), and overwhelming evidence of his guilt. Hendee v. State, 92 Nev. 669, 670, 557 P.2d 275, 276 (1976) (per curiam); Drummond v. State, 86 Nev. 4, 8–9, 462 P.2d 1012, 1015 (1970).

7. *The Inquiry into the Detective's Residence.*

On cross-examination appellant attempted to ascertain the residential address of Detective Lee. Appellant contends that

---

[11] It is significant that the challenged statements here came near the end of the interview after the appellant had given the police virtually all of the inculpatory information.

the trial court's refusal to order disclosure infringed upon his sixth amendment right to confront witnesses. *See* Smith v. Illinois, 390 U.S. 129 (1968); Alford v. United States, 282 U.S. 687 (1931). In Brown v. State, 94 Nev. 393, 580 P.2d 947 (1978), we held that the accused's right to a meaningful cross-examination does not establish an absolute right for the disclosure of a witness' address, but rather we would look to the disclosures regarding personal and employment history made by the witness and the extent and nature of the cross-examination. Here, as in *Brown,* it is of importance that the witness is a police officer and not an informer in that the motive and background of the police officer differs considerably from an informer. United States v. Alston, 460 F.2d 48, 53 (5th Cir. 1972); People v. Pleasant, 244 N.W.2d 464, 466–67 (Mich.App. 1976).

Moreover, the witness gave his true name and occupation, and fully described his professional involvement with the appellant. The detective was also thoroughly cross-examined by defense counsel who failed to make a showing how disclosure of the officer's address would make his cross-examination any more meaningful. There is no error.

8. *Sufficiency of the Evidence to Support the Death Penalty.*

We are required to review imposition of the death penalty pursuant to NRS 177.055 and must consider: "(a) Any errors enumerated by way of appeal; (b) Whether the evidence supports the finding of an aggravating circumstance or circumstances; (c) Whether the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor; and (d) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases in this state, considering both the crime and the defendant." The appellant concedes that there is sufficient evidence to support the finding of the first aggravating circumstance, a previous felony conviction involving violence. He contends, however, that the other aggravating circumstances are unsupportable and, without their support, the mitigating evidence outweighs the evidence in aggravation. We disagree.

NRS 200.034(4)(a) provides that only one aggravating circumstance is necessary for imposition of the death penalty. There is, however, substantial evidence to support the finding of the other aggravating circumstances. The attempted sexual assault is supported by such evidence as the victim's nearly nude body, the bloodstains on the victim's body and the appellant's undershorts, as well as the bite marks on the victim's abdomen, breasts, and in her vaginal area.

Similarly, there is substantial evidence to support a finding that the murder involved torture, depravity of the mind, or mutilation of the victim. There is extensive evidence demonstrating the heinous, brutal nature of the beating which resulted in the death of Darlene Joyce Miller. Considering both the crime and the defendant, we conclude that the death penalty is not excessive or disproportionate to the penalty imposed in similar cases in this state. *E.g.,* State v. Sala, 63 Nev. 270, 169 P.2d 524 (1946). *See* Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965). *Cf.* Briano v. State, 94 Nev. 422, 581 P.2d 5 (1978) (life imprisonment); Pinana v. State, 76 Nev. 274, 352 P.2d 824 (1960) (life imprisonment).

Lastly, appellant contends that "the sentence of death was imposed under the influence of passion, prejudice or any arbitrary factor." NRS 177.055(2)(c). The record is devoid of any such evidence.

*9. Penalty Hearing Jurisdiction.*

Appellant next contends that the trial court was without jurisdiction to conduct the penalty hearing because Chapter 598 of the 1977 statutory amendments, 1977 Nev. Stats. ch. 598, at 1626, repealed the provisions of Chapter 585 of the same amendments, 1977 Nev. Stats. ch. 585, at 1541 (amending NRS 200.030), which prescribed the circumstances under which the capital penalty may be imposed for first degree murder. Both enactments came during the 1977 session, with Chapter 598 passing three days after Chapter 585. There is nothing in the sexual assault legislation which indicates a repeal of the capital punishment law. Indeed, the legislative scheme shows that the two laws are completely separate. Additionally, both laws went into effect simultaneously on July 1, 1977 pursuant to statute. NRS 218.530. Repeals by implication are disfavored. Ronnow v. City of Las Vegas, 57 Nev. 332, 364, 65 P.2d 133, 145 (1937). We decline to find either an express or implied repeal of Chapter 585.

*10. Statutory Terms.*

Finally, appellant apparently contends that the trial court committed reversible error when it instructed the jury, using the term "rape" instead of the new phrase "sexual assault." On this record, we perceive no error. State v. Murray, 67 Nev. 131, 147–48, 215 P.2d 265, 273–74 (1950). Although the court used the language of the statute before its amendment, NRS

200.5011 (amended 1977), there is no showing that the use of the term "rape" misled the jury as to a matter of law.

We affirm the convictions of first degree murder and robbery, together with the judgments and sentences of death plus fifteen years.

Mowbray, C. J., and Thompson, J., concur.

Batjer, J., concurring:
I concur in the result.

Gunderson, J., concurring:
I also concur in the result only.