Henry **DEUTSCHER**, Petitioner,

v.

Harol **WHITLEY**, Warden of the Nevada State Prison; and Brian McKay, Attorney General of the State of Nevada, Respondents.

No. CV–N–86–445–ECR.

United States District Court, D. Nevada.

March 23, 1988.

Greg Costello by David J. Burman, Stephen R. Illa and Perkins Coie, Seattle, Wash., and Thomas E. Perkins, Carson City, Nev., for petitioner.

Brian McKay, Atty. Gen. by Brian Hutchins, Carson City, Nev., and Robert J. Miller, Clark County Dist. Atty. by James Tufteland, Deputy, Las Vegas, Nev., for respondents.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

The Court, by its order of December 17, 1987, ordered that an evidentiary hearing be held with respect to the ineffective assistance of counsel claims in count one of this petition. The hearing was held on January 6, 1988, at which time the Court received evidence and argument relating to Public Defender Ahlswede's representation of the petitioner at the murder trial in 1977. In order to set these issues in their proper temporal framework, it is necessary to review the complete history of this case.

The petitioner was convicted of murder and sentenced to death in Clark County, Nevada, in November 1977. His attorney at that time was Public Defender Ahlswede. Ahlswede appealed the petitioner's conviction directly to the Nevada Supreme Court, but that court affirmed the conviction in October, 1979. Ahlswede then petitioned the United States District Court on behalf of his client for a federal writ of habeas corpus in January, 1980, but that petition was dismissed, apparently for failure to exhaust all state remedies.

The petitioner then returned to the state system to exhaust. A post-conviction petition was filed in June, 1980, and dismissed shortly thereafter. The state supreme court affirmed this dismissal in July, 1981. The petitioner then sought a federal writ of habeas corpus in August, 1982. Judge Foley reached the merits of that petition, and found that there was no basis for relief contained therein. Petitioner appealed this decision to the Ninth Circuit. At this time, Mr. Ahlswede ceased to represent the petitioner, and current counsel substituted in.

Counsel immediately attempted to amend the petition before the Ninth Circuit to include all the claims in the present petition. This request was denied, ostensibly because these added claims were unexhausted in the state system. The Ninth Circuit affirmed Judge Foley's order of dismissal.

The petitioner and his counsel then returned to the state system again. In May, 1983, they filed a new post-conviction petition, which contained, among other things, claims that Ahlswede's representation of the petitioner at the trial level had fallen below the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This petition was amended in May, 1985, and ultimately denied in November of that year. The state supreme court upheld that order in September, 1986.

The petitioner then set his sights on the federal system once again, and filed a second petition for the writ of habeas corpus in September, 1986. The state argued strenuously that the claims presented in that second petition were barred by the doctrine of procedural default, as they had not been presented properly to the state courts. The state courts had indeed refused to consider the merits of the claims for that failure. Because the procedural default argument seemed to have merit, the Court held an evidentiary hearing on the issue of procedural default and the existence of cause and prejudice on May 11, 1987. The main thrust of the petitioner's argument was that his counsel, Mr. Ahlswede, was ineffective in his failure to raise the claims, and that cause and prejudice had therefore been established. (It is important to note that ineffective assistance of counsel was debated at the first evidentiary hearing purely as a means of establishing cause and prejudice, and not as a substantive habeas corpus count.)

As a result of that evidentiary hearing, the Court issued an order on June 25, 1987, in which it found that the petitioner had not established cause and prejudice, as he had not shown that his attorney had been defective in failing to raise the issues

presented in counts 2, 3, 5, 6, 7, 9, and 10 of the current petition. These claims were found subject to the procedural default rule, and were dismissed from the petition. The Court did find that former counsel had rendered insufficient assistance for *Strickland* purposes on count 8. This claim was allowed to remain in the petition. Counts 1 and 4 were never the potential subject of the procedural default, as they had been raised properly in the state courts. Of the original counts in the petition, therefore, only counts 1, 4, and 8 remain.

## COUNT ONE/INEFFECTIVE ASSISTANCE OF COUNSEL

This count contains eleven separate claims for relief, all of which must be addressed separately. The petitioner contends that his attorney's assistance fell below the reasonableness standard in *Strickland*, as he (1) failed to challenge the constitutionality of the torture/depravity of mind instruction (count 1(d) of the petition); (2) failed to challenge the penalty phase burden of proof instruction (count 1(e)); (3) failed to challenge the lack of scienter in finding the petitioner eligible for the death penalty (count 1(f)); (4) failed to object to the introduction of hearsay and character evidence at the penalty phase (count 1(g)); (5) failed to object to prosecutor's misstatements with respect to mitigating circumstances (count 1(h)); (6) failed to object to the "doubling up" of aggravating circumstances (count 1(i)); (7) failed to present a penalty phase defense (count 1(j)); (8) failed to introduce evidence of insanity at the guilt phase, where psychiatric testimony would have indicated the petitioner's mental illness (count 1(k)); (9) failed to call the petitioner at the guilt phase (count 1(1)); (10) failed to investigate the petitioner's past psychiatric history (count 1(m)); and (11) conceded the petitioner's guilt at the penalty phase and argued that the aggravating circumstances presented were not subject to dispute (count 1(n)).

## COUNTS 1(e), 1(f), 1(g), 1(h), and 1(i)

The Court notes, however, that it has already decided that Mr. Ahlswede's representation did not fall below the *Strickland* standard with respect to counts 1(e), 1(f),

1(g), 1(h), and 1(i) listed above. These five counts were also named as independent substantive bases for relief in the petition. Thus, for example, while count 1(d) alleges that counsel was ineffective for failing to challenge the burden of proof at the penalty phase, count six alleges that the burden of proof instruction used by the count was unconstitutional. Yet count six was subject to procedural default, and the petitioner attempted to defend against this rule by showing that counsel was ineffective for failing to raise that claim. The Court decided, as described above, that there was no ineffective assistance of counsel in failing to raise count six. Inasmuch as the standard for establishing attorney ineffectiveness for cause and prejudice is also the *Strickland* test, the Court has already decided the ineffectiveness issue in count 1(e). *See Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986). Ineffective assistance of counsel count 1(f) similarly corresponds with count 2, count 1(g) with count 10, count 1(h) with count 3, and count 1(i) with count 5. As these issues have been decided by the Court's previous order, that order is law of the case with respect to them, and the issues may not be relitigated here.

COUNT 1(d)

This ineffective assistance of counsel count is similarly related to count 4 of the petition, Count four, however, was not the subject of a procedural default count, and the Court has therefore not made any rulings with respect to counsel's performance. Because this count is so strongly tied with count 4, it does seem logical to delay decision until consideration of count 4, as the prejudice plank of the *Strickland* test requires the same inquiry as will count 4.

COUNT 1(j)

In this count, the petitioner argues that Ahlswede's representation fell below the *Strickland* standards when he failed to put on any penalty phase defense. Review of the record indicates that Ahlswede did not call any witness or introduce any independent evidence at the penalty phase. He did, however, cross-examine all prosecution witnesses, and did make a closing argument to the jury. Thus, to state that he failed to put on any penalty phase defense whatsoever is not entirely correct. The question, more aptly put, is whether he failed in his duties under *Strickland* by not introducing any evidence of his own.

This issue is easily laid to rest. As the Eighth Circuit has recently noted

> [T]he fact that mitigating evidence is not set forth does not inexorably lead to a conclusion of ineffective counsel. One must look further as to why the mitigating evidence was not produced. If counsel has through neglect failed to discover such evidence, then counsel will be found ineffective. If, however, the mitigating evidence is not produced because counsel, after reasonable investigation and exercise of professional judgment, has determined that withholding of such evidence is the more strategically sound course, then there has been no ineffectiveness.

*Laws v. Armontrout*, 834 F.2d 1401, 1410 (8th Cir.1987); *see also Campbell v. Kincheloe*, 829 F.2d 1453, 1462 (9th Cir.1987). That the petitioner's attorney did not introduce any evidence at the penalty phase in this case is not of itself a basis for habeas relief. The relevant inquiry focuses upon the reasons that attorney had in not producing any such evidence. Counts 1(k) and 1(m) allege that Ahlswede ignored evidence vital to the effective penalty phase defense of his client without substantial reason for doing so. Count 1(j) will therefore be considered in conjunction with those two counts.

COUNTS 1(k) and 1(m)

In these two counts, the petitioner contends that Ahlswede's representation was constitutionally flawed in that he failed to introduce evidence of insanity at the guilt phase, where psychiatric evidence existed that tended to prove that the petitioner suffered from a mental illness. Similarly, the petitioner argues that Ahlswede failed to investigate the petitioner's psychiatric background, including his family, former teachers, his 1967 sexual assault conviction, and his previous psychiatric records. By failing to investigate the petitioner's

past, and by failing to introduce evidence of mental illness, the petitioner contends that his former attorney deprived him of his key defense at the penalty phase—insanity.

It appears to the Court that counts 1(k) and 1(m) really state both planks of the *Strickland* test. In count 1(m), petitioner argues that his attorney exercised unreasonable professional judgment in failing to investigate his psychiatric background sufficiently. In count 1(k), petitioner then argues that he was prejudiced by counsel's failure to introduce that evidence at the penalty phase. The Court will consider the counts in that fashion.

■ Whether counsel's failure to investigate adequately the petitioner's background in search of mitigating evidence amounts to ineffective assistance of counsel depends on whether counsel made a decision, supported by reasonable professional judgment, not to pursue this evidence. *See, Burger v. Kemp,* — U.S. ——, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987); *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Armstrong v. Dugger,* 833 F.2d 1430, 1432 (11th Cir.1987); *Profitt v. Waldron,* 831 F.2d 1245, 1428–49 (5th Cir.1987); *Campbell v. Kincheloe, supra,* pg. 1101.

■ In this case, it appears that Mr. Ahlswede's decision not to pursue the petitioner's psychological history was unreasonable, in light of all of the circumstances. At the state evidentiary hearing on this issue, which has been made part of this record by the parties, Mr. Ahlswede testified that he had determined before the guilt phase that the insanity defense would not be viable in this case. Counsel rested his conclusion upon the results of an electroencephalogram performed upon the petitioner, and the resulting interpretation of that test which yielded no evidence of organic brain deficiency. *See* Exhibit L (Reporter's Transcript of Post–Conviction Hearing, July 12, 1985) at pg. 88. Counsel thus made a reasoned decision not to pursue insanity *as a substantive defense to the crime of murder.*

Petitioner's evidence at this Court's hearing on ineffective assistance of counsel has made clear, however, that evidence which may properly be rejected at the guilt phase of a death penalty case must be reexamined in light of the issues presented at the penalty phase. Especially where psychological evidence is concerned, the fact that the insanity defense may not ever be successful as a substantive defense should not automatically preclude consideration of that evidence from the penalty phase. That evidence may well save the defendant from the death penalty, even if it cannot save him from conviction.

In this case, the record shows that Mr. Ahlswede did not consider any psychological evidence in his penalty phase preparation. Counsel admitted this failure at the state evidentiary hearing:

Q. You'd agree that you did not satisfy the obligation to investigate fully the potential mitigating factors. Isn't that correct?

A. As regarding his background.

Q. And including potential mental health problems? Yes?

A. Yes.

Q. And including the possibility of intoxication and the amount of intoxication on the night of the defense?

A. Yes.

Exhibit L, pg. 80. Counsel did make a tactical decision not to pursue the insanity defense at the guilt phase of the trial, which is the kind of decision virtually untouchable under *Strickland.* The record is clear that he made no such reasoned decision with respect to the penalty phase. Indeed, he made no decision at all.

If Mr. Ahlswede had delved further into his client's background, he would have discovered evidence that the petitioner was a premature baby, that he had severe medical problems in the first months of life and was not expected to live. The testimony of Dr. O'Gorman at the state post-conviction hearing indicated that premature infants often display various symptoms of organic brain deficiencies, and suffer from other mental problems later in life. Further in-

vestigation into the petitioner's background would also have uncovered involuntary commitments to New York psychiatric hospitals, and the records attendant thereto. Investigation of these records would have revealed the fact that the petitioner had been diagnosed as a paranoid schizophrenic on one occasion, and that he had registered positive for organic brain damage on an earlier EEG. There was therefore a fair amount of important evidence to be uncovered by further investigation into the petitioner's background.

The failure to investigate petitioner's background is especially perplexing in light of the fact that Mr. Ahlswede's only argument to the jury centered around the petitioner's mental state. In essence, counsel posited to the jury the proposition that a sane man could not have committed such a violent and brutal murder. Therefore, he contended, his client was not a candidate for the death penalty because of his mental infirmity. This appeal to the jury regarding the petitioner's mental state was the only substantive argument which counsel put forth in the penalty phase. Counsel did contend that no expert evidence was required to establish the petitioner's mental illness, but it seems that the real reason that no psychological evidence was introduced at the penalty phase was that counsel either never considered doing so or had failed to complete a thorough investigation which would have uncovered such evidence. This failure to pursue evidence was therefore not based upon a reasonable tactical decision of counsel, and was therefore ineffective. *See, Burger v. Kemp,* —— U.S. ——, 107 S.Ct. 3114, 3124, 97 L.Ed.2d 638 (1987) (reasonable decision that psychological evidence should not be used not ineffective); *Profitt v. Waldron, supra,* pg. 1102, at 1249 (failure to investigate psychological background where insanity was the only available defense was ineffective under *Strickland.*)

■ Having determined that counsel's performance at the penalty phase did not measure up to the first *Strickland* plank, the Court must now decide whether the petitioner was prejudiced by counsel's fail-

ure to pursue this evidence. In determining whether prejudice exists, the Court must determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland, supra,* pg. 1100, at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* In this case, the Court cannot say that there is a reasonable probability that the psychological evidence which would have been presented would have changed the outcome of the penalty phase.

At the evidentiary hearing held by this Court, the respondents presented the testimony of Dr. Master, a psychiatrist from Las Vegas familiar with the petitioner's case. Dr. Master interviewed the petitioner in 1977 at the request of Mr. Ahlswede, who had obtained a court order for such an examination. In Dr. Master's opinion, the petitioner has an anti-social personality, which is unrelated to mental illness. Specifically, Dr. Master indicated that the petitioner lied at various times during the examination in order to make his story more likely to result in a finding of mental illness. Further, Dr. Master indicated that the petitioner lacked the classic symptoms of psychosis: hallucinations; inability to think logically; and loss of memory. Based upon his review of the petitioner, the witness found the petitioner in 1977 not to suffer from any mental illness. This opinion was conveyed to Mr. Ahlswede.

Dr. Master did not have available to him in 1977 the New York medical records and other psychiatric history in dispute here. He did, however, review these documents before testifying at this Court's hearing. Based upon that review, Dr. Master found that the 1963 New York diagnosis of the petitioner's mental illness was mistaken. His conclusion was that the state of psychiatry, especially where alcohol related disfunctions are concerned, has advanced significantly since the 1960s, when the petitioner was first diagnosed as having a mental illness. Dr. Master reemphasized that the diagnosis in 1963 of schizophrenia was correct to the extent of psychiatric knowl-

edge at the time. Taking into account recent advances in the field, however, the witness found the old diagnosis unacceptable. Additionally, Dr. Master interpreted the early EEG, and found that it was actually normal. He did indicate that portions of the EEG tape were illegible, and that that could have accounted for the early diagnosis of organic brain disfunction. Thus, Dr. Master disagreed with the finding of the New York hospitals that the petitioner suffered from a mental illness. Instead, Dr. Master stated that the petitioner was a violent individual who lacks a social conscience.

Dr. Master also disagreed with Dr. O'Gorman, the psychiatrist who had examined the petitioner in 1977. As stated above, Dr. O'Gorman testified in the state post-conviction proceedings that the petitioner did suffer from an organic brain disfunction. Although Dr. Master indicated that he has a great deal of respect for Dr. O'Gorman, he did testify that O'Gorman's diagnosis of organicity was mere speculation. Dr. Master pointed to the weight of psychiatric evidence he had previously discussed, and stated that the previous diagnoses of organicity were unfounded.

Thus, it appears that the petitioner would not have gained much if Mr. Ahlswede had investigated his psychiatric background to the extent required by *Strickland.* The substantial weight of the psychiatric evidence presented to this Court indicates that the petitioner is not mentally ill, and that he instead lacks a social conscience. The Court is aware that the petitioner need not have been diagnosed as having a full fledged mental illness in order for the psychiatric evidence to help avoid the death penalty. In this case, however, it appears that the evidence would have stood an equal chance of harming the petitioner's case more than it helped. A jury, presented with evidence tending to show that the petitioner was abused as a child, and that he failed to develop normal social senses, could easily find that these facts did not outweigh the aggravating circumstances presented by the state. Indeed, it seems likely that telling the jury that the petition-er lacks a social conscience is likely to be found as an aggravating circumstance itself. *See Whitley v. Bair,* 802 F.2d 1487, 1495 (4th Cir.1986) (in a markedly similar case, the court found that the introduction of psychiatric evidence had an equal potential to tip the scale of justice toward death, instead of in the petitioner's favor); *Thompson v. Wainwright,* 787 F.2d 1447, 1454 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987) (none of the psychiatric evidence presented indicated that the petitioner suffered from a specific disturbance at the time of the crime which might have mitigated his participation); *cf., Armstrong v. Dugger,* 833 F.2d 1430, 1434 (11th Cir.1987) (prejudice found where evidence indicated that the petitioner suffered from epileptic seizures, organic brain damage, and mental retardation). In light of the extremely equivocal nature of the psychiatric evidence which the jury in this case would have heard, the Court cannot say that there is a reasonable probability that the outcome of the penalty phase hearing would have been different had the evidence been produced.

This conclusion is buttressed by the evidence of aggravating circumstances which the jury did hear. Specifically, the jury heard evidence that the petitioner had committed one other violent sexual assault. In addition, it heard evidence that the murder was committed during the commission of another felony—namely, robbery. Further, the prosecution introduced evidence of the violence which was involved in the killing of the victim of this murder. Specifically, the jury learned that the petitioner smashed the victim's head in with a rock or other hard object with such violence as to render the head almost unrecognizable. In addition, there was testimony that the petitioner sexually assaulted the victim while she was alive or dead. In view of the fairly heinous nature of the crime in this case, it seems unlikely that such weak psychiatric evidence would have spared the petitioner from the death penalty. *Thompson v. Wainwright, supra,* pg. 1100, at 1453 (where testimony of the brutal torture murder of the victim was presented to the

jury, there was no reasonable probability that psychiatric evidence would have altered the jury's decision); *Celestine v. Blackburn,* 750 F.2d 353, 358 (5th Cir. 1984), *cert. denied,* 472 U.S. 1022, 105 S.Ct. 3490, 87 L.Ed.2d 624 (1985) (potentially mitigating psychiatric evidence held no reasonable probability of affecting the jury's decision in light of grisly aggravating circumstances). The heavy weight of the aggravating circumstances in this case would have been unaltered by the presentation of the overlooked psychiatric evidence. These counts therefore fail to meet plan two of the *Strickland* test.

COUNT 1(*l*)

■ In this count, the petitioner argues that Ahlswede was ineffective for failing to call the petitioner or any other person as penalty phase witnesses. As stated above, the question for ineffective assistance of counsel is whether counsel made a reasonable decision not to put the petitioner or other individuals on the stand at the penalty phase. In this case, it does not appear that petitioner's testimony would have had any effect on the sentence if he had testified, and that the prejudice plank is missing from the *Strickland* analysis. *See Strickland v. Washington, supra,* pg. 1100, at 697, 104 S.Ct. at 2069 (court can forego determination of ineffectiveness plank if it is easier to dispose of claim on the ground of lack of sufficient prejudice).

With respect to the petitioner's testimony, it is clear that there was no prejudice in failing to put him on the stand at the penalty phase. The petitioner argues that he would have stated that he remembered arguing with the victim, that he had been drinking and smoking marijuana, and that he blacked out. Further, the petitioner would have testified that he did not intentionally hurt anyone. It appears to the Court that there is no reasonable probability that this testimony would have affected the outcome of the penalty phase. As noted above, the aggravating circumstances found by the jury were both multiple and severe. In view of the heavy weight of these circumstances, the testimony of the petitioner is highly unlikely to have had

any effect at all. There was therefore no prejudice in failing to present this testimony to the jury. *Cf., Thompson v. Wainwright, supra,* pg. 1104.

■ With respect to counsel's failure to present the testimony of other witnesses, the petitioner has failed to identify specifically who those witnesses would have been and what their proposed testimony would have shown. Without this information, it is impossible for the Court to examine the prejudice plank. In this regard, the petitioner has failed in his burden of proof. To the extent that the petitioner argues that counsel should have called psychiatric witnesses, including experts and/or family members, the Court has dealt with that issue above. This count therefore fails to establish any basis for relief.

COUNT 1(n)

■ In the remaining ineffective assistance of counsel count, the petitioner argues that counsel's concession of guilt and argument that the aggravating circumstances were not subject to dispute fell below the *Strickland* standards. This need not detain the Court for long. It is apparent from counsel's penalty phase argument that he was attempting to shift the focus dramatically to the only mitigating circumstance—mental illness. In so doing, it was almost required that counsel admit that the petitioner committed the act of murder. In addition, the thrust of counsel's argument was that no sane individual could have committed such a brutal slaying. Thus, it was also necessary not to dispute the aggravating circumstances. Counsel's argument was therefore part of an obvious strategy, and is not a basis for ineffective assistance of counsel. *Wilson v. Butler,* 813 F.2d 664, 671 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988) (counsel's concession of guilt at penalty phase not ineffective where part of an obvious strategy).

COUNT 4

In this count, the petitioner argues that the aggravating circumstance of torture, depravity of mind, and mutilation of the

victim was unconstitutional as applied to him. Citing *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the petitioner argues that this particular aggravating circumstance, and the instructions used to explain it, is unconstitutional as it gives no basis for distinguishing this case, in which the death penalty was imposed, from the many in which it was not. *Id.*, at 433, 100 S.Ct. at 1767.

Nevada Revised Statutes § 200.033(9) provides that first degree murder may be aggravated if the jury finds that the murder involved torture, depravity of mind, or the mutilation of the victim. In this case, the jury was specifically instructed as to the definition of each of the three elements of § 200.033(9).*

■ As an initial matter, the Court finds that the jury instructions in this case were specific enough in their definition of the aggravating circumstances that the general problems described in *Godfrey* were avoided. In *Godfrey,* the state courts had simply used the terms "torture," "depravity of mind," and "mutilation" without giving them any more specific definition. It was this lack of further definition which resulted in the Court's finding these aggravating circumstances unconstitutionally vague. *Id.*, at 419, 100 S.Ct. at 1759. In the present case, the specificity of the jury instructions removes this case from the general unconstitutionally vague category.

■ The petitioner further argues, however, that the individual definitional instructions themselves were unconstitutional. Regarding the depravity instruction, the petitioner argues that it allowed the jury to find an aggravating circumstance

from the fact that the defendant was legally insane and unable to tell the difference between right and wrong or to appreciate the value of human life. It appears to the Court, however, that the depravity instruction given by the state courts is not so nearly coequivalent with an insanity instruction as the petitioner suggests. Legal insanity usually requires that the defendant suffer from a mental disease or defect which prevented him from understanding right and wrong. The depravity instruction does not reach such a level of psychiatric sophistication. It merely requires that there be a "condition" of mind such that the defendant lacks a moral sense, and possesses an evil or vile state of mind. Where the concept of legal insanity seeks to destroy the intent necessary to commit a crime, therefore, this depravity instruction seeks to explain more fully the type of intent necessary for the death penalty.

In addition, as stated above, the Courts have recognized that the petitioner's psychiatric problems can be a two-edged sword. They have therefore held that it is not always prejudicial to leave such testimony out of penalty phase proceedings. *See Whitley v. Bair, supra,* pg. 1104. Similarly, there appears to be no constitutional impropriety in using the petitioner's depraved state of mind as an aggravating circumstance against him.

The petitioner argues further that the mutilation instruction allowed the jury to find an aggravating circumstance from the "mere" fact that strangulation was the cause of death, rather than a "cleaner" cause, such as a gunshot wound. Initially, the Court notes that the probable cause of

---

* The jury was instructed as follows:

*INSTRUCTION NO. 21 (torture)*
The essential elements of murder by means of torture are (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, persuasion or for any other sadistic purpose. The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased nor does it necessarily require any proof that the deceased suffered any pain.

*INSTRUCTION NO. 22 (depravity of mind)*
The condition of mind described as depravity of mind is characterized by an inherent deficiency of moral sense and rectitude. It consists of evil, corrupt and perverted intent which is devoid of regard for human dignity and which is indifferent to human life. It is a state of mind which is outrageously, wantonly vile, horrible, or inhuman.

*INSTRUCTION NO. 23 (mutilation of victim)*
You are instructed that the term "mutilate" means to cut off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to make it imperfect.

death was established as the severe and crushing blow to the side of the skull, which rent the victim's head open on the side. *See Deutscher v. State*, 95 Nev. 669, 601 P.2d 407, 410–411 (1979). Petitioner's characterization of the victim's cause of death as "mere" strangulation is thus factually inaccurate.

■ Additionally, the petitioner had sexually abused the victim before or after killing her. There was evidence adduced at trial of sexual assault, and of bite marks on the victim by the petitioner's teeth. It appears that all of the injuries inflicted upon the victim occurred while the victim was still alive, with the blow to the head being the last lethal injury. *Id.* From the evidence presented in this case, the Court finds that this was not the type of "ordinary" murder which the *Godfrey* court found ineligible for the death penalty.

Finally, the petitioner argues that none of the justifications for the death penalty should turn on the method of killing where the jury is instructed that the pain felt by the victim is irrelevant. The Court fails to see the constitutional reasoning behind this argument, and the petitioner cites no federal authority for this proposition. The task of the jury in the penalty phase is to determine whether the defendant's actions warrant his execution. In making this determination, the method of killing is a critical factor. It may be that "clean" methods of murder, such as poison or firearms, do not suffice for the death penalty, where brutally beating the victim to death does. The brutality of the murder therefore has at least as much to do with the mind of the perpetrator as with the pain felt by the victim. That the jury was instructed to disregard the victim's pain is therefore of no moment. Count 4 thus states no basis for habeas relief. In addition, there was no prejudice in failing to raise these *Godfrey* claims. Count 1(d) is therefore also without merit.

COUNT 8

The petitioner finally argues that potential jurors were improperly excluded from the jury pool because of their views about the death penalty. Specifically, the petitioner argues that juror Gossard should not have been excluded, because his views regarding the death penalty were equivocal, and he did not express his absolute opposition to capital punishment. Juror Norris should not have been excluded, in the petitioner's estimation, as the court did not ask the juror whether he would be able to set aside his personal convictions about the death penalty. Neither argument has merit.

■ In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court refined the test for determining whether jurors who were opposed to the death penalty had been impermissibly excluded from capital juries. The court indicated that where a "juror's views would 'substantially impair the performance of his duties as a juror in accordance with instructions and his oath,'" the juror could properly be excluded for cause. *Id.*, at 424, 105 S.Ct. at 852 *citing Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). In addition, the *Witt* court noted that the jurors bias against the death penalty need not be proved with "unmistakable clarity." *Id.* In view of this standard, neither of the two potential jurors was improperly excluded.

With respect to prospective juror Gossard, the transcript from the jury selection in the case shows that he harbored deep feelings against the death penalty which would have impaired his ability to function as a juror.

Q. (Mr. Ahlswede)
Now, following those guidelines, do you feel that in no case you could ever impose the death penalty, or do you feel that in a proper case, following those guidelines, you might be able to impose the death penalty?
A. I don't think I could.
Q. Under no conditions?
A. No sir. I don't think I could.

\* \* \* \* \* \*

Q. (Mr. Harmon)
But we need to have jurors who can consider objectively either the death penalty, life without the possibility of parole

in the State Penitentiary, or life with the possibility of parole.

Now, my question is can you imagine any set of facts or circumstances where you feel that the punishment of death was proper?

A. I just put myself in this man's position. That's the only way I can look at it. And I would—I would just have to say from the time I lived, this time I lived in this area, this time, I just—the death penalty is something I just can't—you know, I could probably make a suggestion, or I could probably deal with it, but I'm really—I guess I really am against the death penalty, you know. There is nothing else I can say.

Q. You are saying you no longer believe in it?

A. No.

Q. In other words, you would automatically, regardless of whatever evidence was presented, you would vote against it; is that what you are saying?

A. Yes. I'd probably have to go that way, Mr. Harmon.

\* \* \* \* \* \*

Q. (Mr. Ahlswede)

Could you imagine any circumstances —for example, somebody, an individual going into a school and slaughtering 20 school children? In a situation like that, could impose the death penalty?

A. Well that's another thing. That's another thing that raises a question, if a man does this, I—I look at it today that nine times out of ten, he's—he's doing this, there's something wrong with him.

Now, I mean, there, if he's going to go in and kill somebody, there must be something, psychiatric problem, or it could be anything at the spur of the moment. Am I supposed to take the man's life? Am I supposed to say he's wrong?

Sure, he's wrong, but where do we all—I mean, lots of us would go off the deep end at some time in our lives. I'm not perfect, and a lot of people are not.

Have to weigh the differences. Might be rehabilitation, might be—sometimes he could be put away nine times out of ten.

The death penalty might work in some cases, but I've seen a lot of times where the death penalty did not, creates a problem, because you hang a man, kill a man, another man takes his place. It's all over again, repertory (sic) of the act.

I don't know really what the guidelines are. I guess newspapers are our worst enemy to some of the people. We read it, we believe it, and so we have to live with it.

Q. So you are saying that you could never under any circumstances at any time impose a death penalty on an individual, no matter how awful the crime was?

A. I never been able to since a few things happened in my life. I just—I just couldn't do it.

The juror's answers to counsel's questions unmistakably indicate his opposition to the death penalty, and his inability to apply it under any circumstances.

The petitioner argues, however, that the juror's somewhat ambivalent response to Mr. Ahlswede's hypothetical involving the 20 school children did not make him a candidate for exclusion under *Witherspoon.* Perhaps the immediate response to that hypothetical would give the Court pause in this regard. Reading the juror's entire response to that question, however, shows that he was unequivocal in his opposition to the death penalty, and that he would never be able to apply it, regardless of the circumstances. This juror was therefore properly excluded, as his answers to the relevant questions proved that his opinions regarding the death penalty would have prevented or substantially impaired his ability to perform as a juror.

Prospective juror Norris was also properly excluded. The petitioner argues, however, that the juror was never asked whether he would be able to set aside his personal prejudice and follow the instructions of the court. Review of the transcript reveals that the juror was never specifically asked this question. It does appear from that record, however, that the juror's bias

against the death penalty was so evident that this specific question need not have been asked.

A. I believe that if a man is found guilty, I could send him to prison for life, but not—not the gas chamber.

Q. (Mr. Ahlswede)

Do you feel that you could never under any circumstances send anyone to the gas chamber?

A. No, I could never.

The prospective juror's answers were clear and unequivocal regarding his feeling about capital punishment. Asking his questions regarding the judge's instructions appears to have been unnecessary.

It nevertheless appears that questions from the state effectively asked the juror whether he would be able to follow the judge's instructions and set aside his personal bias.

Q. (Mr. Harmon)

But as Mr. Ahlswede set out, if a jury found—the State, as you know, has to prove guilt beyond a reasonable doubt. The Court will tell you what that means legally in this state, and that is the yardstick that you would use to measure, "Did the State establish beyond a reasonable doubt that that man is guilty of murder in the first degree?"

Then, after that's done, there will be another penalty trial to which there will be probably additional evidence offered, and then the Court would again instruct you as to "This is the yardstick. You determine whether you and 11 other people think that this crime committed by this man of first-degree, if you find that he is guilty of first degree, is worth of, or should the proper penalty be death?"

What I am asking you is could you, with an open mind, look at it, see first if you thought that the proper penalty would be death, and then, if with an open mind you along with your 11 other jurors felt that death was the proper penalty, could vote to impose that penalty on that man sitting right there?

A. I—I don't believe I could just send no one to death. I just don't.

\* \* \* \* \* \*

Let me say that I'm not a very religious person, but I do believe in the Bible, and the Bible says thou shalt not kill. I just feel like if I could do that, I'm killing someone.

The questions asked by the state thus placed before the juror the role of the judge in giving instructions, and the role of jurors in following those instructions. In response to that question, the juror nonetheless indicated that he could never impose the death penalty, regardless of the "yardstick" given by the judge. The relevant question does appear to have been asked of this juror, therefore. His bias against capital punishment would also have prevented or substantially impaired his ability to function as a juror. There was therefore no *Witherspoon* error in excusing this juror.

IT IS, THEREFORE, HEREBY ORDERED that the petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.

IT IS FURTHER ORDERED that the stay of execution entered by the Court in this case shall continue for thirty days from the date of this order, so that petitioner may perfect his appeal, if so desired. At the end of that thirty days, the stay shall expire.